## COMMONWEALTH *vs.* JOSEPH EUGENE.

Essex. September 9, 2002. - January 2, 2003.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & SOSMAN, JJ.

*Abuse Prevention. Evidence,* Prior misconduct, Relevancy and materiality, Verbal completeness, Hearsay, Prior conviction, Impeachment of credibility. *Practice, Criminal,* Capital case. *Homicide. Mental Impairment. Malice.*

At a murder trial, the judge did not err in admitting in evidence an abuse prevention order obtained by the victim five months prior to her death by stabbing, where such evidence was relevant both to the Commonwealth's theory of the parties' deteriorating relationship and to the defendant's claims about that relationship, and where the judge's limiting instructions repeatedly given to the jury explained that the sole use they could make of this evidence was for the purpose of assessing the relationship between the parties. [348-350]

At a murder trial, the judge did not err in excluding portions of the defendant's statement to the police that chronicled the events of the day the victim was stabbed, where the defendant's statement, when offered to prove the truth of the statement's contents, was inadmissible hearsay, and where the doctrine of verbal completeness was not applicable. [350-352]

At a murder trial in which defense counsel was allowed to impeach one of the Commonwealth's witnesses with prior convictions, the judge properly precluded inquiry about the length of sentence served by the witness, where it was the fact of the conviction, and the nature of the crime committed, that could be considered on the issue of the witness's credibility, not the sentence. [352-353]

This court declined to grant relief under G. L. c. 278, § 33E, to reduce the verdict of murder in the first degree on the theory of extreme atrocity or cruelty either on the basis that the infidelity of the victim constituted reasonable provocation that would reduce the crime to voluntary manslaughter, or on the basis that the defendant lacked the mental state necessary for a finding of malice. [353-355]

INDICTMENT found and returned in the Superior Court Department on September 3, 1997.

The case was tried before *Richard E. Welch, III*, J.

*Carlo A. Obligato,* Committee for Public Counsel Services (*Christopher Skinner*, Committee for Public Counsel Services, with him) for the defendant.

*Gregory I. Massing,* Assistant District Attorney, for the Commonwealth.

SOSMAN, J. The defendant was convicted of murder in the first degree on the theory of extreme atrocity or cruelty in connection with the July 30, 1997, stabbing death of the woman with whom he lived. On appeal, the defendant claims error in three evidentiary rulings at trial: (1) the admission of an abuse prevention order obtained by the victim five months prior to the killing, (2) the exclusion of portions of the defendant's statement to the police, and (3) the exclusion of the length of the sentence served by one of the Commonwealth's witnesses on an unrelated criminal conviction. He also requests that, pursuant to our power under G. L. c. 278, § 33E, we reduce the verdict to voluntary manslaughter. For the following reasons, we affirm the conviction and decline to reduce the verdict.

1. *Facts.* Viewed in the light most favorable to the Commonwealth, the evidence was as follows. For approximately twelve years, the defendant and the victim had lived together along with their three children and another child from the victim's prior relationship with another man. On February 21, 1997, the victim had obtained a temporary abuse prevention order against the defendant. She did not seek to extend the order when it expired ten days later, and she ultimately recanted the allegations on which that order had been based.

Sometime in the spring of 1997, the victim became an avid member of a newly formed church. Shortly thereafter, she became romantically involved with another church member, one Willie Lester. The defendant became aware of the victim's affair with Lester and was distraught at the prospect that the victim might leave him. Approximately two weeks before the killing, the defendant told the victim's aunt that he felt like killing himself, the victim, Lester, and the children. On the night of July 19, 1997, when the victim had not returned from work, the defendant and one of his sons went looking for her. In the early morning hours, the defendant found her with Lester, parked in a car in front of Lester's house. The defendant reached into the car and struck the victim, demanding that she and Lester get out. The victim instead began to drive away, whereupon the defendant leapt on the hood of the car. As the car kept moving,

the defendant slid off. He was treated at a hospital,[1] and returned home later that morning.

On his return home, the defendant discovered the victim and Lester in bed together. The victim screamed at him, telling him that it was "over" and that she wanted him to leave. He went to stay at a friend's house nearby. The next day, the defendant confronted Lester, telling him to leave the victim alone. The defendant grabbed Lester by the throat, knocked him down, and hit him several times.

Although continuing her relationship with Lester, the victim let the defendant return home within a few days. The defendant had one of their sons telephone Lester and leave a message on Lester's answering machine to the effect that Lester should leave his family alone. At church, the defendant again confronted Lester. Lester told the defendant that he intended to marry the victim, but assured the defendant that he was not trying to take the children away from him. The defendant warned Lester to stay away from the victim.

On the evening of July 30, 1997, the victim had planned to go to her cousin's house to record gospel music. At approximately 7:30 P.M., the victim called her cousin to tell her that she would not be coming. The victim explained, "I am just tired of [the defendant] hunting me down like a dog when he can't find me." The cousin heard the defendant's voice in the background, saying "he was tired of this F'n . . . S and he's not a slave and he is not going to take this anymore." The defendant picked up another telephone, at which point the victim hung up. The defendant told the cousin, "I feel like killing her. I love her so much, I feel like killing her." The cousin then handed the telephone to her husband, who also spoke with the defendant. The defendant repeated that he wanted to kill the victim, and expressed anger that she was seeing another man.

The victim then left the house, taking the children to a nearby park. On her return, she and the defendant began arguing. When the victim headed into the bedroom, the defendant got a large knife from a drawer in the kitchen. He then followed the victim into the bedroom, where he stabbed her repeatedly. According

---

[1] The defendant acknowledged that his only injury was scraped knees.

to the medical examiner, there were nineteen stab wounds, including several which punctured the victim's heart. Two stab wounds were inflicted after the victim was already dead. There were also multiple wounds on the victim's hands and arms, which the medical examiner characterized as defensive wounds.

Immediately after the stabbing, the defendant took a bottle of bleach from the kitchen, poured some into a cup, drank it, and proceeded to vomit on the victim's back. He then telephoned a friend, one Gene Chrystosom, who arrived within a few minutes. Chrystosom found the defendant dazed and foaming at the mouth, his clothes stained with blood. The defendant told Chrystosom that the victim had tried to make him drink bleach. Chrystosom saw the victim lying on the bedroom floor, and asked the defendant what he had done. The defendant replied, "She's dead." After advising the defendant to contact the police, Chrystosom left the house.

The defendant telephoned the police emergency number, asking for an ambulance. He told the dispatcher that his girl friend had stabbed herself. When ambulance personnel and fire fighters arrived, the defendant told them differing versions of what had happened. To one, the defendant said that the victim had given him something to drink and that he had awoken on top of her. To another, he said that the victim had made him drink bleach, "so [he] jumped on her back." When police arrived, he told one of the officers that the victim had given him something to drink, that he had thought it was water, but on realizing it was bleach, he had beaten her and jumped up and down on her back.

The defendant was taken to the Lynn police station. After receiving the Miranda warnings, the defendant gave a statement.[2] In that statement, he claimed that he had been half asleep when the victim returned with the children and that he only remembered drinking something and falling down. When he woke up, he found himself lying on top of the victim. He

---

[2]Prior to trial, the defendant filed a motion to suppress the various statements he had made, both at the scene and at the station. The motion was denied. On appeal, the defendant makes no claim of error with respect to the denial of that motion. We have reviewed the record, and the motion judge's findings, pursuant to our obligation under G. L. c. 278, § 33E, and we see no error.

noticed blood on the floor and on his hands, and vomit on the victim's back.

At trial, the defendant testified that the victim had attacked him with a knife and that he had killed her in self-defense. He claimed that the victim, who weighed almost one hundred pounds more than he did, had been physically abusive to him during their relationship. The defendant testified that on February 21, 1997 (the day that the victim had obtained a temporary abuse protection order against him), the victim had slapped and bitten him, and that all he had done to her was to shove a sandwich in her face. He claimed that, on the night he had found the victim with Lester in the automobile, the victim had deliberately tried to run him over. On the night of the stabbing, he had gone into the bedroom to get his medicine. The victim yelled at him and swung a knife at him twice, missing both times. He ran to the kitchen and got a knife. The victim chased him and blocked his way, forcing him back into the bedroom. The defendant claimed that he then stabbed the victim three times.[3] He denied any memory of striking more than three blows, but did not dispute the medical examiner's opinion that the victim suffered nineteen stab wounds. After the stabbing, the defendant wanted to kill himself. He drank bleach, but then vomited. He testified that the stabbing had nothing to do with the victim's affair with Lester, and he denied ever making any threats to kill the victim.

The defendant acknowledged that he had given different versions to the police and to Chrystosom. In those statements, he had omitted any reference to the victim having attacked him, because he did not "want to talk bad about her." The defendant also presented testimony from a psychologist on the subject of battered spouse syndrome. The psychologist testified about the nature of abusive relationships and opined that abused men are particularly prone to keep the abuse secret. She also explained that when abuse victims kill the perpetrator of the abuse, they often suffer amnesia, confusion, and feelings of guilt.

The case was presented to the jury on the theories of deliber-

---

[3]On cross-examination, the defendant testified that the victim had dropped her knife before he stabbed her, and he acknowledged that the victim's hands were up in a defensive posture when he struck the first blow.

ate premeditation and extreme atrocity or cruelty. The jury found the defendant guilty only on the theory of extreme atrocity or cruelty.

2. *Discussion.* a. *Evidence of the temporary abuse prevention order.* Over the defendant's objection, the judge allowed the prosecutor to introduce evidence of the February 21, 1997, abuse prevention order that the victim had obtained against the defendant. The judge excluded the application for the order and the victim's affidavit in support of that order.[4] At the time the order was introduced in evidence, the judge gave a limiting instruction, explaining to the jury that the order could only be considered on the issue of the relationship between the defendant and the victim as it may bear on the defendant's motive on the day of the stabbing. The next day, the defendant moved for a mistrial because of the alleged error in introducing evidence of the abuse prevention order. The judge denied the motion, but gave the jury further instruction concerning the procedures involved in obtaining such an order. He explained that the victim had obtained the order by going to court and submitting a sworn statement, at a time when the defendant was not present and therefore not able to present his version. He further explained that such an order automatically expires in ten days, unless the complaining party returns to court to seek to renew it, and that the opposing party would have an opportunity to be present and to be heard at that time. He informed the jury that the victim had not attempted to renew this particular order, and further that she had later recanted the underlying allegations: "That is, she takes them back. She says: What I said to obtain this restraining order did not happen." The judge again reminded the jury that the sole purpose for which they could use the evidence concerning the order was with respect to the parties' relationship.

There was no error. Evidence that a victim has obtained an abuse prevention order against the defendant is admissible to demonstrate the existence of a hostile relationship, as the relationship may be relevant to the defendant's motive to kill. See *Commonwealth* v. *Sarourt Nom*, 426 Mass. 152, 160 (1997);

---

[4] He also redacted from the order a reference to the defendant's involvement in another criminal case.

*Commonwealth* v. *Martino*, 412 Mass. 267, 280-281 & n.9 (1992); *Commonwealth* v. *Gil*, 393 Mass. 204, 215-216 (1984). The defendant argues that the order here was irrelevant, because the Commonwealth's theory of a hostile relationship was premised on the defendant's jealousy regarding the victim's affair with Lester, which did not begin until some time after the February 21, 1997, order. That the Commonwealth's theory focused on the increased tension in the parties' relationship stemming from the victim's later involvement with another man did not preclude the Commonwealth from showing that that relationship had been a hostile one even earlier.

Indeed, the defendant himself presented evidence of an allegedly long-standing abusive relationship, with himself as the victim of that abuse. As part of that defense evidence, he presented his version of the events immediately prior to the victim's obtaining the abuse prevention order, again claiming that he — not the victim — was the one who had been physically abused on that occasion. The fact that the victim had sought and obtained an abuse prevention order against the defendant five months prior to the fatal stabbing was relevant to both the Commonwealth's theory of the parties' deteriorating relationship and to the defendant's claims about that relationship.

The defendant also argues that the temporary nature of the order here distinguishes it from the abuse prevention orders admitted in evidence in other cases. Cf. *Commonwealth* v. *Sarourt Nom, supra*; *Commonwealth* v. *Martino, supra*; *Commonwealth* v. *Gil, supra*. The duration of the order does not affect its relevance. The relevant fact is that the victim and the defendant were, for whatever reason, sufficiently estranged that an order was sought. Whether the order was renewed or not, it evidences the existence of some form of dispute, tension, or hostility between the victim and the defendant at a point in time very shortly prior to the victim's involvement with Lester and only five months prior to the defendant's killing the victim.

The defendant finally argues that, even though the judge excluded the victim's underlying affidavit on hearsay grounds, the mere fact that the order issued would cause the jury to assume that some incident of serious violence must have occurred for the court to issue such an order. We are unpersuaded that

the admission of the order had any such prejudicial effect. The limiting instructions repeatedly given to the jury explained that the sole use they could make of this evidence was for the purpose of assessing the relationship between the parties, and not for any other purpose. The judge's further explanation of the procedure by which a party may obtain such a temporary order, the one-sided nature of the presentation that underlies such a temporary order, the victim's failure to renew the order, and her ultimate recantation of the underlying allegations, were more than adequate to dispel any notion that the mere issuance of the temporary order meant there had been some grave misconduct on the part of the defendant. Indeed, in context, the jury heard the defendant's version of the events on the day in question, without knowing anything of the victim's version, other than that she had completely recanted her allegations shortly after having made them. In that posture, there was no conceivable prejudice to the defendant.

b. *Exclusion of portions of the defendant's statement.* At trial, the Commonwealth introduced the portion of the defendant's statement that chronicled the events of the day the victim was stabbed. Invoking the doctrine of verbal completeness, the defendant sought to introduce other portions of his statement, specifically, those portions detailing how he found the victim and Lester together in her car ten days earlier and how, on his return from the hospital later that same morning, he had found the victim in bed with Lester. The judge excluded the portions proffered by the defendant, ruling that the doctrine of verbal completeness was not applicable. There was no error.

The defendant's statement, when offered by the defendant to prove the truth of the statement's contents, is inadmissible hearsay. See *Commonwealth* v. *McLaughlin*, 433 Mass. 558, 564-567 (2001); *Commonwealth* v. *Fatalo*, 345 Mass. 85, 87 (1962). Here, the defendant sought to introduce portions of his statement to prove the truth of what he had said in those portions, i.e., to prove that the victim had been with Lester, had tried to run the defendant over with her car, and had been found in bed with Lester later that same morning.

In order to be admitted under the doctrine of verbal completeness, the additional portions of the statement must be (1) on the

same subject as the admitted statement; (2) part of the same conversation as the admitted statement; and (3) necessary to the understanding of the admitted statement. *Commonwealth* v. *Clark*, 432 Mass. 1, 14 (2000). The purpose of the doctrine is to prevent one party "from presenting a fragmented and misleading version of events by requiring the 'admission of other relevant portions of the same statement or writing which serve to "clarify the context" of the admitted portion.' " *Commonwealth* v. *Garrey*, 436 Mass. 422, 436 (2002), quoting *Commonwealth* v. *Carmona*, 428 Mass. 268, 272 (1998). Thus, the mere fact that the Commonwealth has introduced a portion of the defendant's statement, or the mere fact that the omitted portions are relevant to the case, does not provide a sufficient basis for admissibility. See *Commonwealth* v. *Leftwich*, 430 Mass. 865, 871-872 (2000); *Commonwealth* v. *Watson*, 377 Mass. 814, 825-830 (1979), *S.C.*, 409 Mass. 110 (1991). Rather, the portions proffered by the defendant must be necessary to a fair understanding of the portions placed in evidence by the Commonwealth.

Here, the Commonwealth only introduced those portions of the defendant's statement that dealt with the events of the day of the stabbing itself. The obvious purpose in doing so was to illustrate the discrepancy between that version of events (in which the defendant claimed that he had passed out after drinking something and had awoken to find the victim dead) and the many other versions he had given at the scene, all of which were different from the claim of self-defense made by the defendant at trial. The portions that the defendant wished to introduce, which pertained to events ten days earlier, were not necessary to an understanding of the version of events the defendant had given with respect to the day of the stabbing. There was nothing out of context or misleading about the Commonwealth's selection of that portion of the defendant's statement. The doctrine of verbal completeness was not applicable, and the judge properly excluded the additional portions of the statement proffered by the defense.[5]

The defendant also hypothesizes that the portions introduced

---

[5]The defendant himself later testified, and his testimony included an account of the earlier confrontation with the victim and Lester, his belief that the

by the Commonwealth, which contained no mention of the victim's affair with Lester, would be puzzling to the jury, who would "speculate at great length why the defendant had not said anything at all to the police about the sexual affair [the victim] was having with Lester." This ostensible concern about jury speculation ignores the theory on which the defendant tried the case. The defendant's position at trial was that he had stabbed the victim in self-defense, that the stabbing had had nothing to do with the victim's ongoing affair with Lester, and that his reluctance to tell anyone about the victim's attack on him was the product of his long-standing history of being abused by the victim. Ironically, a statement to the police in the immediate aftermath of the stabbing that appeared to say nothing whatsoever about Lester would be consistent with the defendant's trial strategy, whereas the statement's actual recitation of the defendant's finding the victim with Lester ten days before the stabbing would have been contrary to the defendant's theory at trial.

c. *Impeachment by prior conviction.* During cross-examination of Lester, defense counsel was allowed to impeach Lester with prior convictions, specifically, convictions of armed robbery, battery, and burglary in 1987 in the State of Georgia. When asked, Lester acknowledged those convictions. Defense counsel also sought to introduce the fact that Lester had been sentenced to fifteen years in prison (ten years to be served, five years on probation) on those charges. The judge sustained the Commonwealth's objection. There was no error.

Within the time limits prescribed by statute, "[t]he conviction of a witness of a crime may be shown to affect his credibility . . . ." G. L. c. 233, § 21. It is the fact of conviction, and the nature of the crime committed, that can be considered on the issue of credibility, not the sentence.[6] The sentence imposed does not logically add anything to an assessment of the witness's

victim had tried to run him over with her car, and his discovery of the victim and Lester together when he returned home later that morning. As a result, the jury ultimately heard the defendant's version of that entire incident.

[6]The statute does make the sentence germane to the issue whether a prior felony conviction can be introduced at all, as the time limitations vary depending on whether the felony conviction resulted in a State prison sentence, as opposed to probation, a suspended sentence, or a jail sentence. See G. L.

credibility, e.g., if the witness was previously convicted of perjury, it is the prior perjury that detracts from the witness's credibility, and the nature or length of the sentence imposed would not make that perjurer more or less worthy of belief. See *Commonwealth* v. *Kalhauser*, 52 Mass. App. Ct. 339, 342-344 (2001); *Commonwealth* v. *Ortiz*, 47 Mass. App. Ct. 777, 781 (1999). Rather than assisting the jury's assessment of credibility, reference to the sentence imposed "has the potential to cause unfair prejudice to the witness by inviting the jury to speculate about the details and seriousness of the conviction and consider the conviction for reasons other than credibility." *Commonwealth* v. *Kalhauser, supra* at 343. We recognize that some jurisdictions do permit the sentence itself to be introduced as part of the impeachment evidence, see *id.* at 344 n.2, and cases cited, but we agree with the Appeals Court that the better reasoned approach is to exclude reference to the sentence.[7] As such, we conclude that the judge properly precluded inquiry about the sentence imposed on Lester.

3. *G. L. c. 278, § 33E.* We have reviewed the entire record, and we see no basis for relief under G. L. c. 278, § 33E. The defendant argues that the verdict should be reduced because the infidelity of his longtime girl friend and mother of his children constituted reasonable provocation that would reduce the crime to voluntary manslaughter. However, the defendant's discovery of the victim's affair occurred a few weeks before the killing. The defendant had ample opportunity to "regain emotional control" after that discovery. *Commonwealth* v. *Andrade*, 422

c. 233, § 21. It is in that context that some of our cases discussing G. L. c. 233, § 21, have referred to the "conviction" as "a final judgment and sentence of the court." *Commonwealth* v. *Hersey*, 324 Mass. 196, 205 (1949) (conviction admissible under G. L. c. 233, § 21, where defendant had been fined and received suspended sentence to State prison). See *Commonwealth* v. *Gallarelli*, 372 Mass. 573, 579 (1977) (conviction of criminal contempt admissible under G. L. c. 233, § 21, where defendant sentenced to six months' incarceration). Those references do not suggest that the nature and length of the sentence is itself to be admitted in evidence as part of the "conviction."

[7]In *Commonwealth* v. *Kalhauser*, 52 Mass. App. Ct. 339, 344 n.2 (2001), the Appeals Court indicated that the sentence could be mentioned during questioning if the witness "denies the conviction or equivocates on questions regarding a prior conviction." Here, Lester did not deny the prior convictions or equivocate when asked about them. There was thus no need to refer to the sentences as a means of confirming or clarifying the fact of those convictions.

Mass. 236, 238 (1996). See *Commonwealth* v. *Rodriguez*, 431 Mass. 804, 812 (2000) (no basis for voluntary manslaughter instruction where defendant had been suspicious of victim's infidelity for several months); *Commonwealth* v. *LeClair*, 429 Mass. 313, 316-317 (1999) (same; defendant suspicious of infidelity for several weeks); *Commonwealth* v. *Brown*, 387 Mass. 220, 227-228 (1982). With respect to the claim that there was provocation in the form of the victim's alleged attack on the defendant, or that he had used excessive force in defending himself against that alleged attack, those theories of voluntary manslaughter were submitted to the jury on correct instructions. We see no reason to disturb the jury's resolution of those issues, as they pertain solely to an assessment of witness credibility.

Finally, the defendant contends that he lacked the mental state necessary for a finding of malice, pointing to the fact that he tried to kill himself moments after the stabbing and to his history of mental difficulties.[8] Nothing in the record suggests that the defendant was incapable of forming the requisite intent for purposes of the element of malice. The defendant also points to the fact that he was acquitted on the theory of deliberate premeditation, and assumes that the jury's verdict on that theory was due to a doubt about his specific intent to kill. The assumption is speculation,[9] and, even if accurate, the theory on which the defendant was convicted — extreme atrocity or cruelty — can be based on any of the three prongs of malice. We see no reason to disturb the jury's determination that the defendant acted with malice. Where the killing was committed by way of nineteen stab wounds, including multiple fatal stabs to the heart

[8]The defendant was initially found not competent to stand trial. After a period of treatment (including medication), the defendant's condition improved significantly and he was then found competent. The defendant does not challenge the finding of competency, and the updated report on the defendant's competence supported the judge's finding.

[9]The jury could well have had a reasonable doubt about deliberate premeditation itself. The defendant had denied making any prior threats to kill the victim, and defense counsel's cross-examination of the witnesses who claimed to have heard such threats illustrated that each version had been exaggerated far beyond that given in more contemporaneous statements to the police. On this evidence, the jury might well have concluded that there was an intent to kill the victim, but that the killing was the product of a sudden, spontaneous outburst, not the product of deliberate premeditation.

and two wounds inflicted after the victim was already dead, the jury also had ample basis on which to conclude that the killing was committed with extreme atrocity or cruelty. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983).

*Judgment affirmed.*