## Commonwealth *vs.* Joshua Whitaker.

Hampden. May 6, 2011. - August 19, 2011.

Present: Ireland, C.J., Spina, Botsford, Gants, & Duffly, JJ.

*Practice, Criminal,* Required finding, Capital case. *Homicide. Evidence,* Fingerprints, Hearsay, Testimonial statement. *Error, Harmless.*

At the trial of an indictment charging murder in the first degree, the evidence was more than sufficient to support the jury's findings of extreme atrocity or cruelty [416-418] and deliberate premeditation [418-419].

This court declined to exercise its power under G. L. c. 278, § 33, to reduce a verdict of murder in the first degree based on the defendant's mental illness, where the defendant's psychological diagnosis, while significant, did not reach a sufficient level of severity, and where there was no evidence that it was intertwined with the victim's killing. [419-421]

At a murder trial, the judge's error in allowing the Commonwealth's fingerprint examiner to offer hearsay testimony regarding the opinions of two other fingerprint examiners, in violation of the defendant's right of confrontation, was harmless beyond a reasonable doubt, given the witness's own opinion, the overwhelming forensic blood evidence, and the defendant's incredible initial explanation of events and subsequent confession to the crime. [421-422]

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the admission in evidence of certain inadmissible hearsay that was not testimonial. [422-423]

Indictment found and returned in the Superior Court Department on September 12, 2006.

The case was tried before *Peter A. Velis,* J., and a motion to reduce the verdict, filed on October 29, 2010, was heard by him.

*Leslie W. O'Brien* for the defendant.

*Katherine E. McMahon,* Assistant District Attorney, for the Commonwealth.

Gants, J. On the evening of August 15, 2006, the victim, Kelsea Owens, was found brutally beaten to death in the yard behind the defendant's house. A jury in the Superior Court convicted the defendant of murder in the first degree on the theories

of deliberate premeditation and extreme atrocity or cruelty. The defendant filed a motion to reduce the verdict to murder in the second degree under Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), which was denied by the judge. On appeal, the defendant contends that the judge erred in denying the defendant's motion for a required finding of not guilty as to murder in the first degree because the evidence was insufficient as a matter of law to sustain a finding of deliberate premeditation and extreme atrocity or cruelty beyond a reasonable doubt. He also urges this court to exercise its authority under G. L. c. 278, § 33E, to reduce the verdict to murder in the second degree. We conclude that the evidence was sufficient as a matter of law to support the defendant's conviction of murder in the first degree. After a complete review of the record, we conclude that there is no basis to exercise our authority under G. L. c. 278, § 33E, to reduce his murder conviction to a lesser degree of guilt or to order a new trial.

*Background.* Because the defendant challenges the sufficiency of the evidence as to murder in the first degree, we summarize the evidence in detail, viewed in the light most favorable to the prosecution.

At approximately 6:45 P.M. on August 15, 2006, the victim telephoned her friend, Amanda Gagne, and made plans to go with her to the defendant's home to "hang out," smoke marijuana, and "have fun."[1] The victim, who was sixteen years of age, was a friend of the defendant, who was twenty years of age at the time of the victim's death.[2] Gagne picked the victim up in her automobile at 7:18 P.M.[3] The victim was dressed in a skirt and a "shimmery" blouse and carried a gold-colored bag. They arrived

[1]Amanda Gagne described the victim as "a very good friend of mine," whom she saw every day that summer to "just hang out and smoke."

[2]The record reveals nothing more about their relationship than Gagne's testimony that the "kind of relationship" the victim had with the defendant was "[f]riendship." Gagne met the defendant through the victim but, before the evening the victim died, had spent time with the defendant only two or three times, and had been to his house only once. On August 15, 2006, before the victim's telephone call, the defendant had telephoned Gagne and awakened her when she was sleeping in the afternoon. She told him that she was sleeping and that he should not call her telephone.

[3]Gagne was able precisely to recall the time of the events that evening because she had made frequent cellular telephone calls and reviewed the times

at the defendant's home approximately fifteen minutes later, parking near the pool in back of the house, where the defendant was waiting for them.

The defendant told them that his mother was home but was going out to get him medication. He said he needed to wait until his mother left because he wanted to sneak into his mother's room to get some money so they could go out.[4] After sitting by the pool for a while, Gagne and the victim returned to Gagne's vehicle and smoked a cigarette while the defendant went inside his house to learn when his mother was leaving. He returned to Gagne's vehicle and suggested that, if they all left, "maybe my mom would leave." He entered the car and said he wanted to show them some "party spots" in the back of his yard. At the defendant's direction, Gagne drove the car down the road, onto a narrow dirt path, through a grass field, and back to the defendant's house. The defendant then said, "Well, maybe if you guys leave, my mom would leave because she gets sketched out when cars are there." Gagne and the victim then drove around in the "phone reception area"; the defendant said he would contact them.

At approximately 8:25 p.m., the defendant telephoned Gagne and told her that the victim needed to come back and be a "lookout." They returned to the defendant's house at approximately 8:30 p.m., where the defendant was sitting on his mother's car waiting for them. The defendant told Gagne she needed to leave, explaining again that his mother "gets sketched out" when cars are parked at the house. Gagne agreed, but the victim, in the defendant's presence, told her to return in forty-five minutes, if not sooner. They told Gagne they would telephone her. At approximately 8:35 p.m., Gagne drove to a location approximately five minutes away from the defendant's home and parked. At 9:05 p.m., she telephoned the defendant's home. His mother answered and Gagne asked for the defendant. The defendant's mother said that the defendant was outside swimming. Gagne

of those calls when she gave a statement to the police. She had telephoned the victim when she approached her home and was at her home within a minute; the victim came out promptly.

[4]The defendant was going to provide the marijuana they planned to smoke that evening.

decided she had waited long enough, and returned to the defendant's house between 9:10 and 9:15 P.M.[5] She parked between the house and the pool, facing the barn, and observed that the yard was "all dark." The defendant's mother came out, and Gagne said she was there to pick up the victim. His mother told her that the victim "was here a little while ago but she's not anymore," and the defendant "was upstairs sleeping — going to bed."

The mother invited Gagne inside the house and, from the downstairs kitchen, she heard the defendant crying upstairs. When the defendant came downstairs and sat on the living room couch, he wore only a pair of shorts and was upset and crying. When Gagne asked where the victim was, the defendant said he did not know and continued to cry. The defendant then said, "Tom Messier did it."[6] When Gagne asked what he did, the defendant said that Messier kidnapped and beat the victim. When she asked why, the defendant said that he owed Messier gambling money. The defendant's mother telephoned the police and reported that the victim was missing.[7]

Gagne asked the defendant why he did not get help, and the defendant said that he was scared that Messier would come after him. During the approximately twenty minutes before the police arrived, the defendant was "incoherent and acting really weird on the couch," "kind of . . . dazed and . . . upset and nervous." Gagne went out to the front and back of the house, and yelled the victim's name, but received no response.

When Sergeant William Joy and Officer Michael Cooney arrived at the defendant's house, the defendant was curled up on a couch, sobbing hysterically. Sergeant Joy asked what was going on, and the defendant repeated over and over that he "was supposed to go into the Army tomorrow; not now, not now."[8] When asked where the victim was, the defendant said that he did not know. When pressed for more information by the police, the defendant said he was in the pool house with the victim and

---

[5]Gagne did not think that the victim had brought a swimsuit with her.

[6]Thomas Messier, who was twenty years of age at the time of the trial, lived with his mother diagonally across the street from the defendant's house.

[7]Officer Michael Cooney of the Hampden police department was dispatched to the defendant's home at approximately 9:15 or 9:20 P.M.

[8]The record is silent as to whether the defendant actually was scheduled to go into the Army the next day.

"some guy" had assaulted him.[9] After further questioning, he identified the assailant as Messier. When the defendant's mother told them that the defendant might have taken an entire bottle of prescription pills, the police contacted an ambulance service.[10]

While waiting for the ambulance, Sergeant Joy and Officer Cooney searched the back yard for the victim. They entered the pool house and found "no sign of a struggle." Officer Cooney then walked across the street to the Messier residence and spoke with Messier. The officer observed "no indication of any type of disarray." At about 7 P.M., Messier and his girl friend had been watching a movie, which had ended fifteen or twenty minutes before Officer Cooney arrived.[11]

After the emergency medical technicians arrived, while Officer Cooney was interviewing Messier, Sergeant Joy told the defendant that they had "found nothing back there," and continued to question him. The defendant said that Messier had beat him up, said, "Now that I've got you alone, I'm going to kill you," and kidnapped the victim. The emergency medical technicians left to transport the defendant to a hospital, and Sergeant Joy and Officer Cooney continued to search for the victim. A short time later, they found her body in an overgrown area of the backyard of the defendant's home, near the pool house, next to the remains of an automobile with no windows or engine.

The ambulance carrying the defendant stopped in Springfield before arriving at the hospital, and Springfield police Detective William Kelly and Officer Thomas Michel entered the ambulance. Officer Michel handcuffed the defendant, telling the

---

[9]Officer Cooney recalled that the defendant said that the assailant had dragged the victim from the pool house, but Sergeant William Roy recalled that the defendant said that the victim "ran off."

[10]The pill bottle contained clonidine, a medication for hypertension. In response to questions asked by a paramedic who responded to the police dispatch, the defendant said he had taken about ten clonidine pills, but his blood pressure and pulse were "fine," and he knew the date, the time, and where he was. The defendant did not challenge the voluntariness of the statements made to Gagne, Sergeant Joy, Officer Cooney, or the paramedic.

[11]In the early morning of August 16, 2006, State police Trooper Christopher Dolan went to Thomas Messier's home and conducted a screening test for the presence of blood on Messier's hands, known as an orthotolidine test. The test was negative.

defendant he was doing so for the safety of the defendant and the officers. The defendant said to Officer Michel, "I'm a murderer."[12] Detective Kelly then read the defendant the Miranda warnings and the defendant said that he understood his rights and was willing to speak with him. Detective Kelly asked him what happened, and the defendant said that he got into a fight with Messier in a side lot of the defendant's yard, that he pushed the neighbor into a picnic table, and then ran into his house and took some sleeping pills. When asked whether he shot or stabbed anybody, the defendant said he did not like guns. When asked if he had killed his girl friend or sister, he said he did not have a girl friend, and that he did not want to be tied down.[13]

A paramedic who had just left the defendant's house quickly returned when she learned that a body had been found. The paramedic attempted cardiopulmonary resuscitation for about one minute but there were no signs of life. The victim was lying on her back in the brush, her face bloodied, her breasts exposed. The "shimmery" blouse she had been wearing was now around her wrists, her bra was above her breasts, some "jean material" from her skirt was above her navel, and she wore no panties.

The subsequent crime scene and forensic investigation revealed a grisly trail of blood, drag marks, and bloody implements. The drag marks began at the back of the barn, where a trash can had been overturned, and ended where the victim's body was found. Near the tree line between the barn and the pool was a depression in the ground about six inches in diameter and two inches deep, suggesting the imprint of a human skull, and in the depression was a pool of blood. Within a few feet of this indentation the police discovered a ball peen hammer to which a twisted clump of hair was stuck in clotted blood. Two ten-pound barbell weights were also discovered near the drag

---

[12]The defendant challenged the voluntariness of his statement that he was the murderer. After a voir dire hearing in which Detective William Kelly testified, the judge found that the statement "was made voluntarily and was the product of a rational intellect." Before Detective Kelly testified, and later in the final instructions, the judge told the jury that they may not consider the statements made by the defendant to Detective Kelly regarding the offense charged unless they find beyond a reasonable doubt that the defendant made the statement and that he made it voluntarily, freely, and rationally.

[13]The defendant said he had a sister who lived in California.

marks, as well as a log and long-handled hedge trimmers, all with blood on them.[14] The victim's panties were found in brush near the drag marks.

The victim had suffered numerous "extreme and very severe" fractures to her skull resulting from between five and six blows to the head, which caused her death. Two of the fractures to her skull had a circular pattern; one was consistent with the blunt force trauma that a hammer blow might cause.[15] Any of the blows to the head could have been fatal. The victim's body had large bruises on her abdomen, with two distinct shoe prints on her right side, and a third shoe print was visible on the cloth of her blood-soaked bra.[16] There was no indication of any trauma to her genital area, and no sperm cells or seminal fluid were found in her vaginal area or on her panties.

There was substantial physical evidence linking the defendant to the victim's killing. A pair of blue jeans and shoes were discovered in the barn with blood on them. Forensic deoxyribonucleic acid (DNA) testing of a swab from the lower right leg of the jeans revealed a DNA profile that matched the DNA profile of the victim.[17] DNA testing of a swab taken from the inside of the jeans, where they would rub against the wearer's leg, revealed a mixed DNA profile; the major profile matched the defendant, and the victim could not be excluded from the

[14]Matthew Dupont, a forensic deoxyribonucleic acid (DNA) analyst and supervisor at Orchid Cellmark, a DNA testing facility, tested four items, including a cutting from a swab of the hammer, one ten-pound weight, and a piece of wood, and found on each item a DNA profile that matched the DNA profile of the victim.

[15]The paramedic observed a three- to four-inch hole in the victim's skull and could see her brain.

[16]The victim also had lacerations or scrapes on her arms and hands, and dirt on her hands. The medical examiner who conducted the autopsy opined that some of the scrapes, including those on her abdomen and one side of her face, occurred after her death based on a distinctive yellow color and a lack of bleeding.

[17]The estimated probability of a randomly selected individual having contributed to this DNA profile was approximately one in 636.1 trillion unrelated individuals in the Caucasian population, one in 53.76 quadrillion unrelated individuals in the African-American population, one in 17.19 quadrillion unrelated individuals in the southwest Hispanic population, one in 3.311 quadrillion unrelated individuals in the southeast Hispanic population, and one in 49.93 quadrillion unrelated individuals in the general Asian population.

minor profile.[18] The shoe prints on the victim's abdomen and bra matched the "manufacturer's design and general condition" of the left shoe.[19]

The police also discovered blood on the latch to the barn door, on the exterior screen door and an inside knob of the kitchen door of the house, and on the door handle of the second-floor bathroom inside the house.[20]

*Discussion.* 1. *Sufficiency of the evidence.* In reviewing the denial of a motion for a required finding, we must determine "whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged." *Commonwealth* v. *Lao*, 443 Mass. 770, 779 (2005), *S.C.*, 450 Mass. 215 (2007), and *S.C.*, *ante* 12 (2011), quoting *Commonwealth* v. *Campbell*, 378 Mass. 680, 686 (1979). In reviewing the sufficiency of the evidence, we keep in mind that the evidence relied on to establish a defendant's guilt may be entirely circumstantial, *Commonwealth* v. *Lao, supra,* and that the inferences a jury may draw from the evidence "need only be reasonable and possible and need not be necessary or inescapable." *Id.,* quoting *Commonwealth* v. *Longo,* 402 Mass. 482, 487 (1988).

The defendant contends that the evidence is insufficient as a matter of law to permit a rational jury to find deliberate premeditation or extreme atrocity or cruelty beyond a reasonable doubt, and that the judgment of conviction should therefore be reduced to murder in the second degree. Because the jury found the defendant guilty on both theories of murder in the first degree, sufficient evidence for one would suffice to affirm the

---

[18]The estimated probability of a randomly selected individual having contributed to this major DNA profile was approximately one in 35.66 quadrillion unrelated individuals in the Caucasian population, one in 890.5 quadrillion unrelated individuals in the African-American population, one in 2.989 quadrillion unrelated individuals in the southwest Hispanic population, one in 127.9 quadrillion unrelated individuals in the southeast Hispanic population, and one in 10.70 quadrillion unrelated individuals in the general Asian population.

[19]Too little DNA was found on the shoes to conduct further analysis.

[20]There was no forensic testimony regarding the source of this blood.

verdict. See *Commonwealth* v. *Hensley*, 454 Mass. 721, 734 n.9 (2009), and cases cited. Here, as we shall discuss, the evidence was sufficient to support both theories.

a. *Extreme atrocity or cruelty.* We evaluate first the sufficiency of the evidence on the theory of extreme atrocity or cruelty. Under the criteria established in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983) (*Cunneen*), a jury must find the presence of one or more of the following factors to convict a defendant of murder in the first degree based on extreme atrocity or cruelty: "(1) whether the defendant was indifferent to or took pleasure in the victim's suffering; (2) the consciousness and degree of suffering of the victim; (3) the extent of the victim's physical injuries; (4) the number of blows inflicted on the victim; (5) the manner and force with which the blows were delivered; (6) the nature of the weapon, instrument, or method used in the killing; and (7) the disproportion between the means needed to cause death and those employed." *Commonwealth* v. *Linton*, 456 Mass. 534, 546 n.10 (2010). See *Commonwealth* v. *Hunter*, 416 Mass. 831, 836-837 (1994), *S.C.*, 427 Mass. 651 (1998).

The defendant argues that the circumstantial evidence "strongly suggests that the victim was killed immediately by the first blow with the hammer," and therefore did not experience suffering. We recognize that the evidence is not clear as to which blow to the skull came first, which instrument was first used, and whether death from the first blow was instantaneous. The medical examiner's opinion was simply that any of five or six blows to her skull could have proved fatal. But even if the hammer blow was first and even if the victim died instantaneously from the blow, that would affect only the first two *Cunneen* factors, not the remaining five.[21] See *Commonwealth* v. *Garabedian*, 399 Mass. 304, 311 (1987), quoting *Commonwealth* v. *Podlaski*, 377 Mass. 339, 348 (1979) ("This court has not required suffering by the victim as an 'indispensable element of the

---

[21] In his closing argument, the prosecutor asked the jury to find extreme atrocity or cruelty based only on the final five factors outlined in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983) (*Cunneen*), having conceded that there was not evidence that the victim was "conscious and suffering during many of these blows."

crime of murder with extreme atrocity or cruelty' "). There was abundant evidence that the defendant dealt at least five blows to the victim's head with sufficient force that any of them could have killed her; that he struck her with a hammer, two ten-pound weights, a log, and hedge trimmers; that he dragged her by the feet along the drag path; and that he stomped with his shoes on her abdomen and bra. This evidence is more than sufficient to support each of the final five *Cunneen* factors.

Where, as here, the assailant repeatedly strikes the victim, a jury need not deconstruct a homicide to determine precisely when the victim died, and then eliminate any subsequent blow in determining whether the manner of the killing was extremely atrocious or cruel. Where the blows were inflicted as part of a single, continuous incident, the jury may consider all of the blows and the defendant's related conduct in evaluating whether the prosecution has proved extreme atrocity or cruelty. See *Commonwealth* v. *Boateng*, 438 Mass. 498, 511-512 (2003) (even if death resulted from first blow, jury may consider that defendant "beat a five-week old baby so severely that he crushed his skull, broke several of his ribs, and seriously damaged his lungs" in determining extreme atrocity or cruelty); *Commonwealth* v. *Eugene*, 438 Mass. 343, 354-355 (2003) ("Where the killing was committed by way of nineteen stab wounds, including multiple fatal stabs to the heart and two wounds inflicted after the victim was already dead, the jury also had ample basis on which to conclude that the killing was committed with extreme atrocity or cruelty"). See also *Commonwealth* v. *Barbosa*, 457 Mass. 773, 802 (2010) ("The fact that [the victim's] heart stopped beating before the blows were inflicted does not negate the relevance of these blows in determining whether the murder was committed with extreme atrocity or cruelty because the defendant may not have known that [the victim] was dead when he repeatedly struck him"). We conclude that the evidence was more than sufficient to support the jury's finding of extreme atrocity or cruelty.

   b. *Deliberate premeditation.* To convict the defendant of murder in the first degree on a theory of deliberate premeditation, the jury must find not only that the defendant intended to kill, but that the defendant decided to kill after a period of reflection.

See *Commonwealth* v. *Davis*, 403 Mass. 575, 582 (1988). See generally Model Jury Instructions on Homicide 8-10 (1999). No particular length of time of reflection is required to find deliberate premeditation; a decision to kill may be formed in a few seconds. See *Commonwealth* v. *Townsend*, 453 Mass. 413, 429 (2009); *Commonwealth* v. *Phillips*, 452 Mass. 617, 635 (2008). Deliberate premeditation may be inferred from the nature and extent of a victim's injuries, the duration of the attack, the number of blows, and the use of various weapons. See *Commonwealth* v. *Townsend, supra* (jury could find that defendant had time for reflection based on evidence of fifty-eight stab wounds committed in two different rooms); *Commonwealth* v. *Phillips, supra* (jury may infer deliberate premeditation based on nature and extent of victim's injuries and lengthy nature of attack); *Commonwealth* v. *Davis, supra* (number of injuries, use of two different weapons, and brutality of beating sufficient to conclude that murder was committed with deliberate premeditation).

Here, the jury reasonably could have found that the defendant contrived to be alone with the victim by asking Gagne to drop off the victim so that she could serve as a "lookout," and that, shortly after he was alone with her, he killed her in a brutal and lengthy assault using various weapons. Even though there was no evidence of motive, this evidence was sufficient to permit the jury to find that the defendant, if only for a moment, reflected on whether to kill her, decided to kill her, and then acted on that decision. See *Commonwealth* v. *Sylvia*, 456 Mass. 182, 188-189 n.15 (2010) (prosecutor not required to prove motive to establish murder in first degree on theory of premeditation). Therefore, we conclude that the evidence was sufficient as a matter of law to support the jury's finding of premeditation, and their verdict of murder in the first degree on the theories of both deliberate premeditation and extreme atrocity or cruelty.[22]

2. *Review pursuant to G. L. c. 278, § 33E.* The defendant

---

[22]The defendant argues that the facts of this case are similar to those in *Commonwealth* v. *McInerney*, 373 Mass. 136, 154 (1977), where we concluded that the circumstances of the homicide would not support a finding of deliberate premeditation. In that case, the defendant went to the victim's apartment at her invitation, where they attempted to have sexual intercourse but were unable because of the defendant's impotence. *Id.* at 139. When she persisted in

urges us to exercise our authority under G. L. c. 278, § 33E, to reduce the verdict to a lesser degree of guilt in consideration of "the defendant's life circumstances." At trial, the defendant did not offer any evidence in his defense. Nor did he contend that he should be found not criminally responsible or that, because of psychological or emotional problems, he was unable to form the intent required for murder in the first degree. However, in his posttrial motion to reduce the verdict to murder in the second degree, the defendant submitted a psychological evaluation prepared by the defendant's retained expert, Dr. Ronald S. Ebert, and various clinical psychotherapist and medical records that showed that the defendant had been sexually and psychologically abused by his father when he was between the ages of five and seven, and that he had been sexually abused by his aunt when he was eight years of age. Dr. Ebert opined that the defendant suffers from posttraumatic stress disorder as a consequence of his sexual abuse and attention deficit hyperactivity disorder. Dr. Ebert added, "These conditions have affected his ability to interact with others, have led him to very significant poly-substance-abuse, and have resulted in a personality structure that can become disorganized when he is under stress."

Our power under § 33E allows us to consider a broad range of mitigating factors in deciding whether there was a miscarriage of justice in convicting a defendant of murder in the first degree, and whether a verdict of murder in the second degree is more consonant with justice. See *Commonwealth v. Colleran*, 452 Mass. 417, 431-432 (2008), and cases cited. But we have reduced a verdict under § 33E only once based on a defendant's mental illness. *Id.* at 432-433. In that case we concluded: "The defendant was suffering from a profound depression, probably psychotic depression, emotionally detached from her own thought processes, and prone to act illogically and contrary to her own self interest," and that the evidence of premeditation

_____

laughing at him, he grabbed a piece of cord or twine from a nearby table and used it as a ligature to strangle her. *Id.* In the instant case, the evidence does not permit a reasonable inference as to what caused the defendant to kill the victim, but the circumstances sharply differ from those in the *McInerney* case in the number and nature of weapons used, the effort required to obtain and use the weapons, the duration of the assault, the number of blows, and the brutality of the beating.

and extreme atrocity or cruelty was "intertwined" with the defendant's mental illness. *Id.* at 432, 433.

The defendant's psychological diagnosis, while significant, does not reach this level of severity, and there is no evidence that it was intertwined with the victim's killing. See, e.g., *Commonwealth* v. *Zagrodny*, 443 Mass. 93, 108 (2004) (declining § 33E relief because "not every defendant suffering from bipolar disorder or other mental illness lacks criminal responsibility for his acts"); *Commonwealth* v. *Eugene*, 438 Mass. 343, 354-355 (2003) (no § 33E relief despite history of mental difficulties and defendant's attempt to commit suicide after killing); *Commonwealth* v. *Prater*, 420 Mass. 569, 585 (1995) (§ 33E relief denied where defendant was nineteen years of age, abused by parents as child, had intelligence quota of "about seventy," and "lifelong history of psychological imbalance"). Therefore, we conclude that there was no miscarriage of justice arising from the defendant's conviction of murder in the first degree.

We have reviewed the entire record pursuant to our duty under § 33E, and have considered two issues that were not raised on appeal. First, over objection, the fingerprint examiner, Trooper Christopher Dolan of the Massachusetts State police, testified that, as part of the verification stage of fingerprint examination, Lieutenant Robin Fabry and Detective Lieutenant Kenneth Martin each compared the latent palm print on the handle of the hedge trimmers with the known palm print of the defendant and concurred with Dolan's opinion that it was "an individualization" to the defendant.[23] The judge erred in allowing Trooper Dolan on direct examination to offer hearsay testimony regarding the opinions of two other fingerprint examiners.[24] See *Commonwealth* v. *Barbosa*, 457 Mass. 773, 784 (2010) ("if a Commonwealth expert on direct examination were to testify to the conclusion or opinion of a second, nontestifying

[23]Moments later, defense counsel renewed his objection to the verification testimony and moved to strike. The judge overruled the objection and denied the motion to strike.

[24]Hearsay testimony regarding the validation of a fingerprint analyst's opinion by another fingerprint analyst would be admissible in a pretrial evidentiary hearing where a judge is asked to determine the admissibility of a fingerprint opinion because the rules of evidence do not apply at such hearings. See Mass. G. Evid. § 104(a), at 9 (2011) (in deciding preliminary questions concerning admissibility of evidence, "the court is not bound by the laws of

expert, that conclusion or opinion would be inadmissible hearsay"). Where, as here, the conclusion or opinion of the nontestifying expert is testimonial, because it was conducted as part of the criminal investigation, its admission violates the defendant's right of confrontation, because the opinion is not subject to cross-examination. *Id.* at 785-786. See *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527, 2532 (2009).

Because the error is constitutional in nature, and because the defendant objected to its admission, we must determine whether the error was harmless beyond a reasonable doubt. See *Commonwealth* v. *Vasquez*, 456 Mass. 350, 360 (2010). "As an appellate court, we ask whether 'on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the [fact finder] and did not contribute to the [fact finder's findings].' " *Id.*, quoting *Commonwealth* v. *Tyree*, 455 Mass. 676, 701 (2010). In view of the strength of Trooper Dolan's own opinion,[25] the overwhelming forensic blood evidence, and the defendant's incredible initial explanation of events and subsequent confession, we conclude that the error was harmless beyond a reasonable doubt.[26]

Second, Detective Kelly testified that he had received a police dispatch saying that an ambulance had pulled over after the person they were transporting had said that he had possibly

---

evidence except those with respect to privileges"); *Dura Automotive Sys. of Ind., Inc.* v. *CTS Corp.*, 285 F.3d 609, 618 (7th Cir. 2002), citing *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993) ("hearsay is admissible at a *Daubert* hearing and the rules of evidence do not apply").

[25]Trooper Dolan testified that there is no accepted standard as to the number of points that must match before a fingerprint examiner may offer an opinion that a latent print matches a known finger or palm print but acknowledged that the Massachusetts State police used to require eight matching points; he found "[a]pproximately sixteen" matching points on the palm print.

[26]We also note that Trooper Dolan opined "in an absolute degree of certainty" that the palm print on a handle of the hedge trimmers matches the right palm of the defendant. In *Commonwealth* v. *Gambora*, 457 Mass. 715, 729-730 n.22 (2010), we declared that "opinions expressing absolute certainty about, or the infallibility of, an 'individualization' of a print should be avoided." Because Trooper Dolan testified to his opinion before this prospective guidance was given, and because the defendant did not object to the certainty of the opinion, we conclude that, if the admission of Dolan's "absolute certainty" were error, it did not produce a substantial likelihood of a miscarriage of justice.

killed someone. The defendant did not object to the admission of this testimony. We conclude that the dispatcher's report was inadmissible hearsay but not testimonial in the circumstances. See *Davis* v. *Washington*, 547 U.S. 813, 822 (2006). We conclude that the error did not produce a substantial likelihood of a miscarriage of justice in view of the defendant's admission to Detective Kelly that he was a "murderer."

Because we find no error that produced a substantial likelihood of a miscarriage of justice, nor any other reason to order a new trial or to reduce the defendant's murder conviction to a lesser degree of guilt, we affirm the judgment of conviction.

*Judgment affirmed.*