NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

19-P-428                                          Appeals Court

COMMONWEALTH  vs.  JOSIAH WATKINS.

No. 19-P-428.

Suffolk.     March 6, 2020. - September 16, 2020.

Present:  Rubin, Maldonado, & Shin, JJ.

Firearms.  Evidence, Firearm, Expert opinion, Hearsay.  Due
    Process of Law, Assistance of counsel.  Constitutional Law,
    Assistance of counsel, Confrontation of witnesses.  Social
    Media.  Practice, Criminal, Assistance of counsel,
    Discovery, Postconviction relief, New trial, Instructions
    to jury.

    Indictments found and returned in the Superior Court
Department on August 14, 2017.

    The cases were tried before Robert N. Tochka, J., and
motions for postconviction discovery and for a new trial were
heard by him.

    Michael A. Waryasz for the defendant.
    Ian MacLean, Assistant District Attorney, for the
Commonwealth.

    RUBIN, J.  The defendant was convicted of possession of a

large capacity weapon in violation of G. L. c. 269, § 10 (m),

and unlawfully carrying a firearm in violation of G. L. c. 269,

§ 10 (a).  Subsequent to his conviction, the defendant filed an initial motion for a new trial, and the Commonwealth, in light of a change in case law, moved to vacate the defendant's conviction on the large capacity firearm charge.  That motion was allowed, the defendant withdrew his initial motion, and the defendant was resentenced on the remaining conviction of carrying a firearm without a license.  The defendant subsequently filed motions for postconviction discovery and for a new trial.  These motions were denied.  The defendant now brings a consolidated appeal from his conviction and the denial of his motions.

Background.  In an affidavit in support of an application for a search warrant, the affiant, Boston Police Detective Brian L. Ball, detailed the following regarding his investigation of the defendant:  On May 8, 2017, two police officers observed the defendant via Snapchat.  Snapchat is a social media application that allows users to send or post still images or videos.  Those whose requests to be friends on Snapchat have been accepted may be described as having been "friended" by the user posting images or videos.  A user may post images or videos to their "story," which allows all those individuals with whom the user is "friends" to view them on the user's Snapchat page, but they remain available for viewing only for twenty-four hours.

On May 8, 2017, the defendant was seen by police in two Snapchat videos. In one posted to the defendant's page, the defendant brandished a distinctive firearm, a "TEC-9," with a magazine separated from it. The defendant filmed a video of himself, recording it in "selfie" style.[1] In a subsequent video, the defendant can be seen in the company of Luis Santos, who was sitting on a bed loading a magazine into a TEC-9 and then aiming the firearm at the camera in the cell phone the defendant was holding. The defendant did not have a license to carry a firearm.

In the videos, Santos and the defendant appear to be in a bedroom. Having been released from custody of the Department of Youth Services, but subject to monitoring, Santos was wearing a global positioning system (GPS) device at the time these videos were posted. After viewing the videos, the officers contacted the electronic monitoring service department at the Department of Youth Services and learned that Santos's GPS device placed him at his home in the Dorchester section of Boston at the time that the videos had been posted on Snapchat. According to the

---

[1] For about a decade the word "selfie" has been widely used colloquially to refer to photographic self-portraits "often snapped at odd angles with smartphones[,]" and "typically made to post on a social networking website (or sen[t] in a text message)[.]" Steinmetz, The Top 10 Buzzwords of 2012, Time, Dec. 4, 2012, http://newsfeed.time.com/2012/12/04/top-10-news-lists/slide/selfie [https://perma.cc/6GWH-NZLZ].

GPS device, which checks the wearer's location every three minutes, Santos was in his home all day on May 8, 2017.

On May 8, 2017, officers monitoring Santos's Snapchat account also observed a video posted to Santos's story depicting Santos holding a firearm magazine, which was observed to be loaded with live rounds. Officers observed another video posted on May 7, 2017, wherein Santos assembled a TEC-9 and magazine on a bed and laid out the ammunition to spell "44 SL." Finally, on May 14, 2017, an officer observed another image, posted by Santos, of a TEC-9 firearm. The image was captioned, "Shyt change on my block trust issues I got put all my trust in semi autos." The TEC-9 is a semiautomatic weapon.

On the basis of this affidavit, on May 16, 2017, the police obtained a search warrant for Santos's home and executed it that same day. Pursuant to the search warrant, they found and seized a TEC-9 firearm with twenty-three rounds of nine millimeter ammunition inside the magazine, along with one loose round of ammunition. The defendant was convicted based on his possession of the firearm as shown in the eight- to ten-second Snapchat video depicting him holding a TEC-9.

Discussion. 1. Knowledge of operability. In order to convict the defendant of unlicensed carrying of a firearm outside his residence or place of business, the Commonwealth was required to prove that he "knowingly ha[d] in his possession; or

knowingly ha[d] under his control in a vehicle; a firearm, loaded or unloaded, as defined in section one hundred and twenty-one of chapter one hundred and forty."  G. L. c. 269, § 10 (a).  A firearm is defined as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than [sixteen] inches or [eighteen] inches in the case of a shotgun."  G. L. c. 140, § 121.  The jury were instructed that "[t]he Commonwealth must . . . prove the [d]efendant knew that the item was a firearm within the common meaning of that term.  If it was a conventional firearm with its obvious dangers, the Commonwealth is not required to prove that the [d]efendant knew that the item met the legal definition of a firearm."

The defendant argues that this instruction misstates the law and that the Commonwealth was required to prove beyond a reasonable doubt that the defendant had actual knowledge the gun in his possession was capable of discharging a shot or a bullet in order for the knowledge requirement to be satisfied.  The defendant raised no objection to the jury charge at trial, but we will assume without deciding that if, indeed, such knowledge were an element of the offense, failure to instruct upon it would have created in this case a substantial risk of a miscarriage of justice.  See Commonwealth v. Amirault, 424 Mass.

618, 647 n.21 (1997) ("when the elements of a crime are incorrectly stated, there is a substantial risk that a person has been convicted for a course of conduct that is not criminal at all"). "Erroneous instructions that allow the jury to convict without finding an essential element of an offense create a substantial risk of a miscarriage of justice unless either the element at issue can be ineluctably inferred from the evidence such that the jury were required to find it, . . . or the jury's verdicts on the other counts on which the defendant was convicted compel the conclusion they necessarily found the element on which they were not instructed" (quotation omitted). Commonwealth v. Mitchell, 95 Mass. App. Ct. 406, 412 (2019).

In light of Commonwealth v. Cassidy, 479 Mass. 527, cert. denied, 139 S. Ct. 276 (2018), this argument, when initially made, had some force. Cassidy held that, to sustain a conviction for possession of a large capacity firearm or feeding device under G. L. c. 269, § 10 (m), the Commonwealth must prove beyond a reasonable doubt that the defendant knew that the firearm or feeding device met the legal definition of "large capacity" set forth in G. L. c. 140, § 121; that is, the defendant must know that the firearm or device was capable of holding more than ten rounds of ammunition. Cassidy, supra at 529. The court interpreted the reach of the term "knowingly" within G. L. c. 269, § 10 (m), to extend not only to the

defendant's possession of the weapon but to his possession specifically of a large capacity weapon: "[O]nce the adverb [knowingly] is understood to modify the object of [the verb possess], there is no reason to believe it does not extend to the phrase which limits that object. Thus, in G. L. c. 269, § 10 (m), 'knowingly' is an adverb that modifies . . . the entire direct object of the verb, 'large capacity weapon'" (quotation and citation omitted). Cassidy, supra at 535-536.

It might have seemed therefore, by a parity of reasoning, that knowing possession of a firearm could not be proved without knowledge that the firearm was an operable one that met the legal definition of the proscribed item set forth in G. L. c. 140, § 121. Although there were appellate decisions construing G. L. c. 269 § 10 (a), to require knowing possession, but not knowledge of operability, subsequent to those decisions, the Legislature had inserted the word "knowing" into the statute. (In the version of the statute previously construed, the court had, "mindful of the . . . need to avoid possible constitutional doubts," implied a knowledge requirement to the act of possession. Commonwealth v. Jackson, 369 Mass. 904, 916 [1976].) Cassidy's emphasis on the Legislature's decision explicitly to put the word "knowing" in the statute could be seen to have supported the defendant's argument. Cassidy, 479 Mass. at 535-536.

However, during the pendency of this appeal, the Supreme Judicial Court decided Commonwealth v. Marrero, 484 Mass. 341, 347-348 (2020), in which it held that, with regard to § 10 (a), knowledge that the item possessed is operable and therefore is a firearm within the definition contained in G. L. c. 140, § 121, is not an element of knowing possession of a firearm.  Rather, the court, reaffirming its decision in Commonwealth v. Sampson, 383 Mass. 750, 762 (1981), held that what is required is "knowledge only that the 'instrument is a firearm within the generally accepted meaning of that term.'  See Sampson, supra at 762."  Marrero, supra at 347.  In reliance on Sampson, we held in Commonwealth v. Papa, 17 Mass. App. Ct. 987, 987-988 (1984), that where "a conventional firearm with its obvious dangers is involved, the Commonwealth need not prove that a defendant knows the exact capabilities or characteristics of the gun which make it subject to regulation."  Under Marrero, Sampson, and Papa, then, the jury instruction in this case was correct, which disposes of this claim of error.  The defendant argues further that the evidence was insufficient to support the knowledge element as he argues it should be construed.  But given our conclusion about the proper construction of the statute, this argument too is unavailing.

2.  Failure of the information in the affidavit.  The defendant argues next that he received ineffective assistance of

counsel in violation of his rights under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. The standard we apply is the well-known one from Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). The defendant must show first that trial counsel's conduct fell "measurably below that which might be expected from an ordinary fallible lawyer," and too that he was prejudiced by that failure. Id.

The defendant argues that trial counsel should have filed a motion to suppress the TEC-9 and other evidence seized pursuant to the search warrant on the grounds that the information providing the probable cause for the warrant was stale. In particular, he argues that Snapchat videos and images that are posted on a particular date may have been taken, created, or recorded at an earlier date and uploaded much later, and that therefore the Commonwealth failed to prove that the information officers relied on from the timestamps on the defendant's and Santos's Snapchat uploads was not stale. He also argues that the police could not establish, even if the firearm had actually been at Santos's house when the videos were posted on May 8, 2017, that it remained in Santos's house on May 16, 2017.

Both these contentions, however, are defeated by the image posted by Santos of what appeared to be the TEC-9 on May 14, 2017. It included a present tense statement about Santos's

perceived need for semiautomatic weaponry. Given that, there was probable cause to believe that the Snapchat image was taken contemporaneously with its posting. It was posted two days before the warrant was executed, and the inference that the firearm remained in Santos's house was not based on stale information. See Commonwealth v. Beliard, 443 Mass. 79, 85-86 (2004) ("in circumstances showing continuous illegal presence of a number of weapons in the defendant's residence over extended periods of time," even six week old information was not stale). As a motion to suppress on staleness grounds would not have been successful, trial counsel was not ineffective for failing to file such a motion. See Commonwealth v. Comita, 441 Mass. 86, 91 (2004).

3. Admission of the firearm certificate. At trial, firearm examiner Christopher Finn testified that the weapon in evidence was an Intratec TEC-9 firearm that was capable of discharging a bullet and that it met the statutory definition of a firearm under G. L. c. 140, § 121. Prior to the conclusion of Finn's direct examination, the judge allowed, over defense counsel's objection, the introduction of Finn's notarized report (report). Although the defendant's objection at trial was not spelled out, on appeal he raises three claims of error with respect to the report's admission.

The defendant argues first that the report was inadmissible because it contains hearsay, not from Finn as the primary examiner, but from reviewing examiner Detective Tyrone Camper, who also signed the report. Indeed, the defendant goes further and asserts that this signature constitutes testimonial hearsay of the reviewing examiner, admission of which violated his right to confrontation. As the defendant puts it, "Here, Mr. Camper's signature as the reviewing examiner is the functional equivalent of testifying that he has reviewed and accepts Mr. Finn's analysis and findings. It is his statement, made out of court, for the proof of the matter asserted, that the firearm tested meets the statutory definition and, thus, is a hearsay statement, which should be held inadmissible without any exception."

To begin with, the premise of this argument is incorrect. The second analyst's signature indicates only that he "[r]eviewed" the report. The Supreme Judicial Court has previously held that, unlike a statement that a second analyst "concurs" in or "verified" the conclusion of the first analyst, a statement that another expert merely "reviewed" that analysis, did not amount to expert hearsay testimony:

> "Expert testimony as to the opinions or conclusions of a
> second, nontestifying expert constitutes inadmissible
> hearsay. See Commonwealth v. Whitaker, 460 Mass. 409, 421-
> 422 (2011). Here, the judge allowed the analyst's
> testimony that the other analyst 'reviewed' her work, but

did not allow testimony that the second analyst verified her work. The analyst . . . did not testify as to the second analyst's independent conclusions. The analyst's testimony stands in stark contrast to the expert testimony at issue in Whitaker, where the fingerprint analyst expert witness testified that two secondary analysts 'concurred' with his conclusions regarding individualization. Id. at 421. Accordingly, we conclude that the judge did not err in admitting the fingerprint analyst's testimony confirming that another fingerprint analyst reviewed her findings."

Commonwealth v. Fulgiam, 477 Mass. 20, 45-46, cert. denied, 138 S. Ct. 330 (2017).

To be sure, here, we are faced not with a statement about what the second analyst, Detective Camper, said, but with his own statement contained within the report. Nonetheless, even if that statement qualifies as inadmissible testimonial hearsay admitted in violation of the defendant's confrontation rights, something we need not and do not decide, and even if the defendant's objection on that ground were preserved by his unspecified objection to the admission of the report, he would not be entitled to relief. That is because the statement that Camper reviewed the report -- unlike a statement of verification or concurrence -- is of almost no significance. Any error from its introduction was harmless beyond a reasonable doubt. See Commonwealth v. Charlton, 81 Mass. App. Ct. 294, 304 (2012) ("To the extent that it was error to permit the certificates of chemical analysis to be submitted to the jury with the

[nontestifying] primary chemist's signature . . . , the error was harmless beyond a reasonable doubt").

The defendant argues next that the information in the report was cumulative and that it improperly bolstered Finn's testimony.  It was, however, not an abuse of discretion for the judge to admit the report when confirmatory of Finn's oral testimony and properly authenticated by him.

The defendant's third argument is that notarization of the report provided a badge of enhanced propriety.  Given that a statute specifically allows a ballistic "certificate" to be admitted, we are unpersuaded by anything before us that this notarized report contained "an additional level of perceived integrity" that would have been viewed by a reasonable juror as more powerful than that conveyed by ballistic certificates routinely admitted as accompanying the examiner's live testimony.  See G. L. c. 140, § 121A.  We therefore see no abuse of discretion or other error of law in the report's admission.

4.  Posttrial discovery.  Finally, the defendant argues that the judge erred in denying his motion for a new trial based on a claim of ineffective assistance of counsel without first ordering discovery concerning the manner in which the police intercepted the defendant's Snapchat communications.  In the trial court, the defendant argued that he was denied the effective assistance of counsel because counsel should have

sought, through discovery, to determine whether the police intercepted the defendant's Snapchat videos through the use of an informant, or by officers requesting that the defendant "friend" them. He argued that counsel could have used that information in support of a claim that a warrant was required before the use of the latter investigative technique.

On appeal, however, the defendant does not renew that claim. He argues for the first time, rather, that the discovery should have been requested because the manner in which the Snapchat communications were intercepted may have been selectively applied to African-American men. His argument here is that trial counsel was ineffective for failing to investigate that possibility in order to raise a selective prosecution defense.[2] Since this claim of error is unpreserved, he can prevail only if there was error that created a substantial risk of a miscarriage of justice. See Commonwealth v. Alphas, 430 Mass. 8, 13 (1999). We find no error.

The defendant notes that in a pending criminal case, Commonwealth vs. Dilworth, Superior Ct., No. 1884-CR-00453 (Suffolk County Jan. 18, 2019), a defendant sought and received an order of discovery that required the Boston Police Department

---

[2] Because no issue is raised here with respect to the Fourth Amendment to the United States Constitution implications of any method of obtaining the Snapchat postings made by a criminal suspect, we express no opinion on the question.

to produce information about the manner in which officers used Snapchat as an investigative tool, in support of an allegation that Boston police have used Snapchat in a racially discriminatory fashion, targeting African-American and Hispanic individuals by seeking to friend them on Snapchat without their knowledge. See Commonwealth v. Dilworth, 485 Mass. 1001, 1001-1002 (2020). Although that discovery order was on appeal at the time of oral argument in this case, the Supreme Judicial Court has recently affirmed an order of the single justice of that court declining interlocutory review of the underlying order of discovery. Id. at 1003.

In his memorandum of decision allowing Dilworth's motion for discovery, the trial judge wrote that "[t]he officer [who Dilworth unwittingly friended] did not identify himself as a police officer, and he did not use either the name or photo of anyone known to Dilworth." The judge allowed discovery of Boston police reports that memorialized the use of Snapchat as an investigative tool, Form 26 reports, for the one-year period from August 1, 2017, to July 31, 2018. Dilworth, 485 Mass. at 1002. The defendant argues before us that, through discovery, trial counsel should similarly have sought to obtain information about the way in which the police gained access to the defendant's Snapchat account in order to raise a similar selective prosecution defense. See id. at 1003 (Dilworth seeks

to raise "a selective prosecution defense . . . lead[ing] to a successful motion to suppress or a motion to dismiss").

The trial judge in this case concluded that an informant had been used to obtain the Snapchat videos, and that, therefore, no discovery was necessary in order to determine the manner by which the videos were obtained. His conclusion was understandable; it was based on a confusingly worded assertion by the Commonwealth on the record before the start of trial.[3] Before us, however, the Commonwealth made clear that it has not and should not be understood to have said that an informant provided the Snapchat videos and images to the police. Nor will it confirm that the police utilized the method of friend request described by the trial judge in Dilworth.

We may assume, however, without deciding, that, as the defendant apparently suspects, the defendant's Snapchat videos were obtained by the same method described by the trial judge in Dilworth: police, not posing as anyone the defendant knew,

---

[3] The Commonwealth moved in limine to limit the scope of the defendant's cross-examination on the police use of Snapchat during their investigation. The prosecutor stated on the record during arguments on this motion that "[t]he Commonwealth's position is that any further information relative to how they obtained that video on social media is privileged, as it's akin to a surveillance privilege, as well as it's also somewhere between the nexus of the privilege as to a confidential informant. And under both of those criteria, the [d]efendant would be unable to meet his burden to turn over any further information."

sought to friend the defendant and he unwittingly agreed. Nonetheless, there was no error in denying the motion for a new trial without allowing posttrial discovery, even if that discovery might have revealed something about the racial composition of the group of individuals whom the police asked to friend on Snapchat because, at least on this record, failure to seek such discovery at the time of trial in this case was not performance by counsel that fell below what would have been expected of an ordinary fallible lawyer.  Saferian, 366 Mass. at 96.

The defendant argues only that counsel should have sought this discovery because of the pendency of the Dilworth litigation.  At the time of trial in this case in May 2018, however, Dilworth had not yet brought his motion for discovery alleging that Boston police were Snapchat "friending" in a racially discriminatory manner.  That motion was not brought until October 2018.  In order to hold that defense counsel here was ineffective on the ground put forward by the defendant for the first time on appeal, we would have to conclude that every criminal defense lawyer in every criminal case in Boston in which a Snapchat posting was used as evidence was required, as of the time of trial in this case, even prior to the motion being filed in the Dilworth litigation, to seek discovery and to pursue the line of inquiry regarding a possible selective

prosecution defense embarked upon by counsel in the Dilworth litigation. Given that no lawyer in any case had brought any such motion, and that the defendant has not placed in the record any information about what evidence might have been available to counsel at that time that could have given rise to a suspicion that racial discrimination was involved in the use of Snapchat by Boston police, we do not think that on this record such a conclusion is warranted.[4] This does not mean that the defendant

---

[4] At the time of argument before us, the Commonwealth had not yet complied with the discovery order in the Dilworth litigation, and no determination has been made in any court about the factual basis of Dilworth's selective prosecution claim. The trial judge decided only that Dilworth made the threshold showing that racial profiling may have resulted in his being targeted by police using Snapchat and that the reports documenting the police use of Snapchat as an investigative tool from the time period of his arrests were material and relevant to his equal protection claim. The judge therefore granted Dilworth's motion to obtain these documents under Mass. R. Crim. P. 17 (a) (2), 378 Mass. 885 (1979), and issued a summons for the records. As the judge noted in granting Dilworth's motion, however, these documents may ultimately show a lack of discrepancy by race in Boston Police Department's use of Snapchat to investigate African-American and Hispanic individuals as opposed to white individuals, or a race-neutral explanation for an existing racial disparity in Boston Police Department's use of Snapchat may ultimately defeat Dilworth's equal protection claim.

The Commonwealth sought relief from the judge's order from a single justice of the Supreme Judicial Court pursuant to G. L. c. 211, § 3, arguing that the judge erred in concluding that Dilworth had met his initial burden. The single justice denied the Commonwealth's petition without a hearing on the grounds that the matter did not warrant the court's exercise of its extraordinary power under G. L. c. 211, § 3. Dilworth, 485 Mass. at 1002. The Commonwealth appealed the single justice's decision to the Supreme Judicial Court. After oral argument in

will not be entitled to seek relief should it turn out that the Boston police indeed utilized Snapchat as an investigatory tool in a racially discriminatory manner.[5]  It means that there was no error in the denial without posttrial discovery of the defendant's motion for a new trial on the grounds of ineffective assistance of counsel.

Conclusion.  The judgment is affirmed.  The orders on the motions for postconviction discovery and for a new trial are also affirmed.

So ordered.

_____

this case, the Supreme Judicial Court issued a decision affirming the single justice's action declining to review the trial judge's order.  Id. at 1003.

[5] Any evidence of racial discrimination with respect to the use of Snapchat that is uncovered, whether in the Dilworth litigation, in this case through further motion practice, or otherwise, may amount to newly discovered evidence that could not with due diligence have been discovered at the time of trial, which may form the basis for a new trial motion in this case, seeking either a new trial at which the Snapchat evidence will be excluded, or dismissal, see Commonwealth v. Franklin, 376 Mass. 885, 895 (1978) (remedy for selective prosecution is dismissal), though of course we express no opinion on any further motion or motions that may be brought in this case.