## COMMONWEALTH *vs.* JEFFREY BLY.

Suffolk. March 11, 2005. - July 13, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* New trial, Assistance of counsel, Capital case, Judicial discretion. *Constitutional Law,* Assistance of counsel. *Evidence,* Impeachment of credibility, Prior conviction.

Discussion of the standard of review where assertions of unpreserved error are offered as the basis of a claim of ineffective assistance of counsel in a criminal defendant's motion for a new trial. [647-648]

This court concluded that the power of resurrection, which permits a judge, when ruling on a criminal defendant's motion for a new trial prior to the defendant's direct appeal, to resurrect issues not raised and properly presented at trial, is no longer viable and will no longer be recognized in criminal cases. [648-651]

At a murder trial, the prosecutor's impeachment of the defendant's key witness with the length and consecutive nature of his current criminal sentences was not improper, where the questions were not designed solely for impeachment under G. L. c. 233, § 21, but for another, permissible reason, i.e., to explain the motivation of the witness, who expected to spend the rest of his life in prison, in coming forward and, seemingly without explanation, confessing to the killing [651-652]; further, the prosecutor's line of inquiry about the underlying details of the witness's prior convictions, while improper, did not give rise to a substantial likelihood of a miscarriage of justice, where the evidence was consistent with the defense theory of the case, where the judge gave repeated limiting instructions, and where the case against the defendant was strong [652-653].

At a murder trial, the judge did not err by failing to exercise his discretion, sua sponte, before admitting evidence of the defendant's prior murder conviction [653], and the defendant failed to demonstrate that his counsel rendered ineffective assistance by failing to seek exclusion of the prior conviction evidence, a tactic that was consistent with the strategy of the defense [653-655]; further, the prosecutor's questioning regarding the prior conviction, which improperly elicited information concerning the identity of the victim and the length of the sentence, did not create a substantial likelihood of a miscarriage of justice, where the judge promptly and forcefully intervened and instructed the jury as to the proper use of prior convictions (an instruction that was repeated at the end of the trial), and where the case against the defendant was strong [655-656].

INDICTMENTS found and returned in the Superior Court Department on August 29, 1996.

The cases were tried before *James D. McDaniel, Jr.*, J., and a motion for a new trial, filed on March 28, 2002, was heard by *Margaret R. Hinkle*, J.

*Dana Alan Curhan* (*Brad P. Bennion* with him) for the defendant.

*Paul B. Linn*, Assistant District Attorney, for the Commonwealth.

The following submitted briefs for amici curiae:

*Andrew Silverman & Brownlow M. Speer*, Committee for Public Counsel Services, for Committee for Public Counsel Services.

*William J. Meade* for District Attorney for the Bristol District & others.

*William M. Bennett*, District Attorney, for District Attorney for the Hampden District.

SPINA, J. The defendant was convicted of the deliberately premeditated murder of Lee Simmons on September 13, 1993, illegally carrying a firearm, and illegal possession of ammunition. He was acquitted of a charge of assaulting Keith Richards with intent to murder. On appeal he argues that he was denied effective assistance of counsel because (1) counsel failed to file a motion to exclude his prior conviction of murder and the prior murder conviction of Damien Bonilla, a key defense witness, used to impeach them pursuant to G. L. c. 233, § 21, and (2) counsel failed to object to the prosecutor's improper questions that elicited details concerning the prior convictions. He also contends that the trial judge erred by not exercising his discretion to exclude sua sponte the prior convictions, and that the judge's limiting instructions did not cure the prejudice. The defendant raised the same issues in a motion for a new trial, the merits of which were considered by a judge other than the trial judge. The motion for a new trial was denied, and the appeal from the denial of that motion has been consolidated with the defendant's direct appeal. The defendant also seeks a reduction in the degree of murder, pursuant to G. L. c. 278, § 33E. We af-

firm the convictions, and decline to grant relief under § 33E.[1]

1. *Background.* During the early evening of September 13, 1993, Lee Simmons and his friend, Keith Richards, were riding their bicycles along Blue Hill Avenue in the Dorchester section of Boston. They had been at the Landor Road apartment of Richards's girl friend. Richards stopped for about fifteen minutes at his aunt's home on Johnson Road. When he rejoined his friend, Simmons was angry and on the verge of tears because the defendant had just taken his bicycle. Simmons, weary from past encounters with the defendant, was determined to recover his bicycle. The two men returned to the house where Richards's girl friend lived and retrieved a nine millimeter Beretta semiautomatic handgun that Richards kept under the back porch.

They walked toward the neighborhood around Leston and Morton Streets, where they knew they could find the defendant. They found him in a group of about ten people. The defendant approached Simmons. Simmons grabbed the defendant by the collar and pointed the gun in his face. He then demanded the return of his bicycle. The group approached, but backed away at Simmons's command. The defendant agreed to return the bicycle. Simmons released him and put the gun under his waistband.

The defendant and his friends started walking toward Morton Street, followed by Richards and Simmons. Richards, concerned that Simmons would not know how to use the gun if things went bad, asked him for it. Simmons gave him the gun. The defendant walked ahead of the group and turned toward a house at 770 Morton Street. Richards walked up a side street directly across from 770 Morton Street and stood behind a parked car. A man ran out of the house at 770 Morton Street and handed a gun to someone standing beside a van parked in front of the house. The defendant ran into the house and within seconds opened a second-floor porch window and began shooting at Simmons. The person beside the van also began firing. Richards tried to return fire, but his gun would not discharge. Other

---

[1]We acknowledge amicus briefs filed by the Committee for Public Counsel Services and the Massachusetts District Attorneys Association.

people who were near the van ran toward Richards and threatened to "get" him, so he fled.

Simmons also fled, but he was struck by two .380 caliber projectiles. One entered the left leg just above the ankle and traveled downward. The other killed him. It penetrated the left side of his forehead, traveled downward and across the midline of the brain, perforated the lower right rear portion of the skull, and came to rest under the scalp. The downward trajectory through his body of each projectile is consistent with someone shooting from above.

Comilus Earl Pope, a friend of the defendant, lived in the attic at 770 Morton Street above the second-floor apartment of his aunt, Gail Langham, who owned the house. Langham knew the defendant because he often visited Pope at the house. At the time of the shooting Langham was in the cellar with a gas company repairman. As she ran upstairs to see what was happening, she encountered the defendant coming from the area of the second-floor porch. He had a gun in his hand. She asked him what he was doing with the gun, but he brushed her off. They argued. In June, 1997, after the defendant was indicted, he telephoned Langham and asked her to recant the testimony she had given to the grand jury. Specifically, he asked her to say that she did not see him with a gun, but testified that she had seen him with it because the police had threatened her.

Deanna Jones, Pope's girl friend, also saw the defendant coming out of the second-floor porch just after the shooting stopped. This was the same porch from which, according to Richards, he saw the defendant shooting at Simmons. Jones ran up to the attic. She could hear the defendant and Langham arguing downstairs. Later, Pope, Damien Bonilla, and the defendant went up to the attic where the defendant admitted firing shots from the second-floor porch. He also said he took the bicycle because Simmons owed him money for drugs.

A passing motorist and a taxicab driver whose cab was struck by a projectile heard shots and saw flashes coming from 770 Morton Street, but they did not see or hear shots coming from the opposite side of the street.

Police officers arrived shortly after the shooting ended, and Langham consented to a search of her house. Police found the

defendant and Bonilla in one attic bedroom, and Pope and Jones in the other. Both rooms were "pitch black." The .380 semiautomatic handgun used to kill Simmons was found in a crawl space in the attic, about eight feet from where the officers first saw the defendant. Two bags containing a total of fifty-six rounds of ammunition were found in a dresser in the bedroom where Pope and Jones had been sitting. One contained thirty-five .380 caliber bullets, and the other contained twenty-one rounds of nine millimeter ammunition. Two fingerprints on the slide and the grip of the .380 handgun were identified as the defendant's. Three cartridge casings found on the ground underneath the open window of the second-floor porch had been ejected from the .380 handgun.

Police also recovered a nine millimeter semiautomatic handgun underneath a porch at 770 Morton Street and ten spent casings on Morton Street in front of Langham's house. The ten casings had been discharged from that same nine millimeter handgun. A nine millimeter spent projectile was found in a wall of the first-floor hallway of the house. It was damaged and could not be compared to bullets fired from any other weapon for purposes of firearms identification, but its location in the hallway and its apparent path (ricocheting off some woodwork and hitting a wall) were consistent with having been fired from inside the house and inconsistent with having been fired from across the street. Neither police nor medical personnel who responded to the scene found a gun or any shell casings near Simmons's body.

Damien Bonilla testified for the defense. On direct examination he said that he was serving a capital murder sentence in Virginia. He testified that he was with the group at the intersection of Leston and Morton Streets when Simmons demanded at gunpoint that the defendant return his bicycle. As the defendant was about to enter 770 Morton Street to retrieve the bicycle, Bonilla heard a gunshot. He drew a nine millimeter gun from his waistband (the one the police found under the porch) and started shooting from alongside a gas company van parked in front of the house. At one point Bonilla handed Pope a .44 caliber revolver, and Pope began to shoot. The gunfire lasted about ten to fifteen seconds. When it was over, Bonilla fol-

lowed the defendant upstairs. Bonilla turned and stepped inside the second-floor porch, opened the window, and surveyed the situation outside. He then went outside and disposed of his gun under a porch before going up to the attic. When police questioned him that night, he denied any participation in the killing. However, he telephoned police from Virginia three years later and confessed to killing Simmons.

On cross-examination Bonilla admitted that he was serving four consecutive life sentences plus eighty years for murder by torture; maliciously wounding two people with a knife, a hammer, duct tape, and bleach; torturing two people; robbery; and other offenses. He admitted he had been incarcerated since July 31, 1996, that he had pleaded guilty to avoid the death penalty, and that he had "absolutely no hope of ever getting out." He was impeached with the numerous inconsistencies in the six statements he previously had given to police. Bonilla telephoned Boston police on September 6, 1996, two days after he was indicted in Virginia, and confessed to killing Simmons. In neither that telephone call nor any of his statements to police did he mention that Pope had been a shooter. In his September 6 telephone call he told police that Pope and Jones ran into the house when the shooting started. In his last statement to police, on September 13, 1996, he said that Pope would not take the gun that he had offered.

The defendant testified. On direct examination he stated that he was serving a life sentence for murder. He testified that he agreed to return Simmons's bicycle after Simmons threatened him with a gun. The defendant led the group toward 770 Morton Street, where he had put the bicycle. He said that as he was about to enter the house he heard the first gunshot, which hit the house. He ran up the stairs and entered the second-floor porch, where he saw flashes coming at him from across the street. He heard bullets hitting the house. As he walked out of the porch he encountered Jones, and followed her up to the attic. Pope appeared in the attic a few seconds later. Pope was holding a .380 caliber chrome handgun, which he placed inside a storage area in the attic. The defendant admitted that he previously had handled the gun. He denied asking Langham to change her story. He said he asked her why she had lied to the grand jury, and he told her to tell the truth.

On cross-examination the defendant acknowledged his prior unrelated convictions for murder, armed robbery, and carjacking, for which he was serving consecutive sentences. The prosecutor asked whom he had killed. The defendant said that he had not killed anyone. Pressed, he said he was convicted of killing Paul McLaughlin, an assistant district attorney who had been prosecuting him at the time. The prosecutor then asked, "And you claim today you did not commit that murder, is that your testimony?" The defendant replied, "Absolutely," and said that he was appealing from the conviction. The prosecutor continued, "[Y]ou're innocent of McLaughlin's murder, yet you were convicted of it. . . . And, of course, you're innocent today of Simmons' murder, am I right?" The defendant replied, "Yes."

The defendant denied telling Jones that he had shot a gun from the second-floor porch window. He also denied any confrontation with Langham after he emerged from the second-floor porch. The prosecutor asked if "[e]veryone is lying except you, the guy who is doing life without parole for killing Paul McLaughlin." The defendant again denied killing McLaughlin. The defendant denied shooting Simmons and insisted that his fingerprints were on the gun because he had handled it weeks before the shooting.

The judge interrupted the cross-examination and instructed the jury that the evidence of the defendant's prior convictions was to be considered only on the question of his credibility, and for no other purpose. He further instructed the jury that "the subject matter of his convictions is irrelevant to this case and you're not to be inflamed by or affected by the fact that a particular person or persons were the subject matter of his convictions. You are not to in any way consider who the subject of those convictions may have been in determining any issue in this case."

Both sides presented their closing arguments later that day. Defense counsel emphasized that the Commonwealth's fingerprint expert conceded that there was no known test to determine when the defendant left his fingerprints on the gun. She contended that the second-floor porch window had only been raised part way, and the opening was not sufficient to

fire a gun. She argued that Pope had fired the .380 handgun, which, she asserted, belonged to him. Counsel pointed out that Jones had testified she brought Pope's gun to 770 Morton Street that day with other personal belongings of his that had been at her apartment. Counsel also noted that police found thirty-five .380 caliber bullets in Pope's bedroom dresser. She accused Jones and Langham of lying to protect Pope, arguing that in their eyes the defendant was "expendable" because he was already in jail and he meant nothing to them, unlike Pope, who was Langham's nephew and Jones's boy friend.

The prosecutor made no mention of the defendant's prior convictions during his closing argument.

In his final instructions the judge told the jury that a witness's prior criminal convictions may only be considered in evaluating the credibility of that witness, and that it is not evidence that the particular witness is a bad person. The judge reminded the jury of his prior limiting instruction as to the defendant's prior criminal convictions. He told them that they could only consider those convictions on the issue of the defendant's credibility as a witness. He emphasized that the defendant's prior convictions could not be considered as proof that he is guilty of the offenses for which he stands accused, and that they could not draw any inference of guilt against him by virtue of his prior convictions. "Furthermore," he continued, "you are not to consider in any way the subject matter of any such convictions as bearing in any way on any verdict that you may return in this case. More particularly as I said yesterday, you must not be inflamed in any matter by the subject matter of any such convictions. As I have said, you may consider them only in connection with your evaluation of the credence or believability to be given to his present testimony before you in court."

2. *Standard of review.* The defendant contends that because the judge considered the merits of the assertions of error in his motion for a new trial, the issues have been resurrected as if properly preserved for direct appeal. See *Commonwealth* v. *Hallet,* 427 Mass. 552, 552-555 (1998). We disagree. The judge addressed the assertions of unpreserved error in the defendant's motion for a new trial only to the extent they provided a basis for claims of ineffective assistance of counsel. Often such claims

depend on assertions of unpreserved error. The judge did not consider the assertions of unpreserved error independent of those ineffective assistance claims.

We recently have eliminated procedural pitfalls created by the near byzantine requirements to avoid resurrection as it once applied to motions for a new trial that alleged claims of ineffective assistance of counsel, and on which the defendant now relies. See *Commonwealth* v. *Stroyny*, 435 Mass. 635, 640 (2002); *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163 n.2, cert. denied, 525 U.S. 1007 (1998). Claims of ineffective assistance and resurrection now are deemed separate and distinct "exceptions" to the waiver doctrine. See *Commonwealth* v. *Randolph*, 438 Mass. 290, 294-296 (2002).[2] As a result, assertions of unpreserved error offered as the basis of a claim of ineffective assistance of counsel in a motion for a new trial are evaluated in a case of murder in the first degree under a substantial likelihood of a miscarriage of justice standard, and in all other cases under the standard in *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). In all cases, assertions of unpreserved error remains unpreserved. *Commonwealth* v. *Randolph, supra* at 296.

The defendant's appeal from the denial of the motion for a new trial therefore raises nothing that is not raised in the direct appeal, and we review the defendant's claims of ineffective assistance of counsel and their underlying assertions of unpreserved error under the substantial likelihood of a miscarriage of justice standard. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

Before leaving the subject of resurrection, we took the opportunity in this case to solicit briefs on the question of the necessity or desirability of retaining the power of resurrection in criminal cases, which permits a judge, when ruling on a motion for a new trial prior to the defendant's direct appeal, to resurrect issues not raised and properly presented at trial. *Commonwealth* v. *Hallet, supra.*

In the *Hallet* case, this court considered abandoning the power of resurrection as to appeals from the denial of a motion for a new trial presented in conjunction with a direct appeal from the

[2]The defendant's motion for a new trial was decided after our decision in *Commonwealth* v. *Randolph*, 438 Mass. 290 (2002).

conviction, as it had with respect to appeals from the denial of a postappeal motion for a new trial, see *Commonwealth* v. *Curtis*, 417 Mass. 619, 623-626 (1994), and it concluded that it would not. The court reasoned that "[w]hen the issue is presented in conjunction with a defendant's first appeal, the strong public interest in finality that we identified in *Commonwealth* v. *Amirault*[, 424 Mass. 618, 639 (1997)], is absent." *Commonwealth* v. *Hallet, supra* at 554. We now identify other strong public interests that persuade us to abandon the power of resurrection in criminal cases.

The power of resurrection arose at a time when criminal defendants had no opportunity to obtain appellate review of unpreserved error. This court recognized the need for such review to address situations where denial of all review of a point affecting substantial rights would result in a miscarriage of justice. See, e.g., *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 25 (1923). The power of resurrection thus came to be. At the time, the only available review concerned preserved error, and therefore when an issue was resurrected, it was infused with new life and transformed to preserved error status for purposes of appellate review. *Commonwealth* v. *Blondin*, 324 Mass. 564, 566-567 (1949), cert. denied, 339 U.S. 984 (1950). If a judge did not resurrect an issue in a motion for a new trial, the issue was deemed waived for purposes of review. *Commonwealth* v. *McKnight*, 289 Mass. 530, 544 (1935).

The power of resurrection subsequently was adopted for review of cases where unpreserved error was raised for the first time on appeal, and not in a motion for a new trial. This gave rise to the "miscarriage of justice" standard, first under G. L. c. 278, § 33E (substantial likelihood of a miscarriage of justice), see *Commonwealth* v. *Gricus*, 317 Mass. 403, 407 (1944), citing *Commonwealth* v. *Dascalakis, supra*, and later in noncapital cases. See *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967) (substantial risk of miscarriage of justice). The miscarriage of justice standards of review provided what was utterly unavailable to defendants at the time the power of resurrection first was devised: appellate review of unpreserved error that otherwise would result in a miscarriage of justice. See *Commonwealth* v. *Dascalakis, supra*. Although they afford a less

favorable standard of review than review enjoyed by issues that have been preserved or resurrected, these standards afford some form of review for all unpreserved error, in contrast to the power of resurrection, which, prior to adoption of the miscarriage of justice standards, opened the door to appellate review only to those issues that had been resurrected.[3] *Commonwealth v. McKnight, supra* at 544. The power of resurrection has served us well, but it no longer makes sense to treat unpreserved error as preserved when we now have standards of review to address precisely the concerns of the court when there was no available avenue of appeal.

As previously mentioned, there are other strong public interests besides finality of judicial decision that we consider in deciding the fate of resurrection. They include judicial efficiency. See *Commonwealth v. Randolph, supra* at 294, citing *Commonwealth v. Pisa*, 384 Mass. 362, 366 (1981). " 'Order in the administration of criminal justice requires that if a defendant is aggrieved by what transpires during his trial,' he must assert a timely objection or claim of error." *Commonwealth v. Pisa, supra*, quoting *Commonwealth v. Stout*, 356 Mass. 237, 243 (1969). The power of resurrection always has been in conflict with the waiver doctrine, which is a cornerstone of our criminal justice system. The conflict originally was seen as necessary. See *Commonwealth v. Dascalakis, supra* at 24-25. With the arrival of the miscarriage of justice standards, that conflict no longer can be justified.

The primary interest of judicial economy has been described as follows:

> "There are many rationales for the raise-or-waive rule: that it is a necessary corollary of our adversary system in which issues are framed by the litigants and presented to a court; that fairness to all parties requires a litigant to advance his contentions at a time when there is an op-

---

[3]The court's decision in *Commonwealth v. Hallet*, 427 Mass. 552 (1998), has impressed on defendants the importance of filing a motion for a new trial before the direct appeal is obtained, if there is any hope for resurrection. The decision does not seem to have had much impact on the intensity with which resurrection is sought. See *Commonwealth v. Curtis*, 417 Mass. 619, 624 n.3 (1994); *Commonwealth v. Underwood*, 358 Mass. 506, 509 (1970).

portunity to respond to them factually, if his opponent chooses to; that the rule promotes efficient trial proceedings; that reversing for error not preserved permits the losing side to second-guess its tactical decisions after they do not produce the desired result; and that there is something unseemly about telling a lower court it was wrong when it never was presented with the opportunity to be right. The principal rationale, however, is judicial economy. There are two components to judicial economy: (1) if the losing side can obtain an appellate reversal because of error not objected to, the parties and public are put to the expense of retrial that could have been avoided had an objection been made; and (2) if an issue had been raised in the trial court, it could have been resolved there, and the parties and public would be spared the expense of an appeal." (Footnote omitted.)

*Commonwealth* v. *Alphas*, 430 Mass. 8, 22 (1999) (Greaney, J., concurring), quoting *State* v. *Applegate*, 39 Or. App. 17, 21 (1979). To this, we add the importance to an appellate court of having the considered opinion of the trial judge on issues that have not been preserved. Trial judges often decline to express their views on the merits of unpreserved error because of the effect their consideration of the merits will have on appeal. The power of resurrection discourages judges from addressing the merits of unpreserved error, to the detriment of appellate courts. Or, to the extent that trial judges address the merits while disclaiming any intent to resurrect the issue, we should not have our standard of review dependent on the presence or absence of such talismanic disclaimers.

For these reasons, we conclude that the power of resurrection is no longer viable and will no longer be recognized in criminal cases.

3. *Impeachment of Bonilla.* The defendant argues that the prosecutor improperly impeached Bonilla with the circumstances, length, and consecutive nature of his Virginia sentences. With one exception, there was no objection. We review claims of unpreserved error to see if they created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163-164 (1998). Generally, "when a record of a witness's conviction of a crime has been introduced to impeach

him, the conviction must be left unexplained." *Commonwealth v. McGeoghean*, 412 Mass. 839, 843 (1992). Similarly, any references to the length of the sentence imposed should be excluded. *Commonwealth v. Eugene*, 438 Mass. 343, 353 (2003). However, where evidence of a prior conviction is offered for another purpose, the rule does not apply. See P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 6.10.2, at 327 (7th ed. 1999 & Supp. 2004). See *Commonwealth v. Killelea*, 370 Mass. 638, 650 (1976) (prior arrests admissible to impeach foundation of defense psychiatrist's expert opinions); *Commonwealth v. Redmond*, 357 Mass. 333, 337-338 (1970) (evidence that defendant testified at prior trial of his alibi witness that contraband that was subject of criminal complaint against alibi witness belonged to defendant, relevant to show motive of alibi witness to testify favorably for defendant).

Here, the length and consecutive nature of Bonilla's sentences were relevant to explain why, after giving four statements to police in which he essentially denied killing Simmons, he would come forward and seemingly without explanation confess to the killing. The fact that he expected to spend the rest of his life in prison was evidence of a motive to lie for his friend, the defendant, and a willingness to shoulder the entire responsibility for the killing. The prosecutor's questions were not designed solely for impeachment under G. L. c. 233, § 21, but for another, permissible reason. Counsel's sole objection to this line of inquiry went to the fact that Bonilla pleaded guilty to avoid the death penalty. The judge acted within his discretion to admit this evidence because it underscored Bonilla's understanding that he would never be released from prison, which the prosecutor reasonably implied left him with nothing to lose and a motive to lie. There was no error. Because there was no error, there is no merit to the claim of ineffective assistance of counsel based on the alleged error. See *Commonwealth v. Thompson*, 431 Mass. 108, 120, cert. denied, 531 U.S. 864 (2000).

The prosecutor's foray into the underlying details of Bonilla's prior convictions cannot be similarly justified, and was improper. See *Commonwealth v. McGeoghean, supra.* However, we perceive no substantial likelihood of a miscarriage of justice. The evidence, which portrayed Bonilla as a torturer and a violent

man, was consistent with the defense theory of the case that Bonilla and Pope were the shooters. In addition, the judge's repeated limiting instruction as to the proper use of prior convictions adequately addressed the prosecutor's error, and the case against the defendant was strong. Because the error did not cause a substantial likelihood of a miscarriage of justice, the claim of ineffective assistance based on the error fails. *Commonwealth* v. *Cohen*, 412 Mass. 375, 389 (1992), citing *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

4. *Impeachment of the defendant.* The defendant argues that (1) the judge erred in not exercising discretion with respect to the use of his prior convictions, (2) the prosecutor improperly elicited the underlying details of the convictions, and (3) counsel rendered ineffective assistance by failing to file a motion to exclude the prior murder conviction and by failing to object to the prosecutor's improper use of the prior convictions. As these issues have not been properly preserved, we review each of the claims, including the claims of ineffective assistance, by considering "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright, supra.*

a. *Failure to exercise discretion.* The defendant first contends that the judge erred by failing to exercise discretion before admitting evidence of the prior convictions. Although the judge could have exercised discretion sua sponte, he was not required to do so, particularly in the face of the legislative judgment expressed in G. L. c. 233, § 21, which implicitly permits impeachment of a defendant by a prior conviction of an offense that is similar to the one for which he is on trial. See *Commonwealth* v. *Carter*, 429 Mass. 266, 269 (1999). In *Commonwealth* v. *Maguire*, 392 Mass. 466, 470 (1984), we said, "We will consider seasonably raised challenges to the admission of evidence of prior convictions of a defendant who testified at trial" under the abuse of discretion standard. Here, the challenge was not seasonably raised. The judge was not required to exercise his discretion absent an objection or a motion in limine. There was no error.

b. *Failure to seek exclusion of prior conviction.* The defendant

contends that counsel's failure to seek exclusion of his prior murder conviction amounts to ineffective assistance. As part of his burden, the defendant must show that such a motion would have been successful. *Commonwealth* v. *Iglesias*, 426 Mass. 574, 579 (1998). Although similarity of an offense weighs in favor of exclusion, there is no per se rule of exclusion of prior conviction of a similar crime for which the defendant is on trial. See *Commonwealth* v. *Whitman*, 416 Mass. 90, 94 (1993); *Commonwealth* v. *Reid*, 400 Mass. 534, 538 (1987); *Commonwealth* v. *Chartier*, 43 Mass. App. Ct. 758, 762 (1997), and cases cited. Where, as here, the prior conviction of murder in the first degree involved the identical crime for which the defendant was on trial, which increases the potential for prejudice; the crime at issue does not bear directly on truthfulness, see *Commonwealth* v. *Maguire*, *supra* at 469, quoting *Commonwealth* v. *DiMarzo*, 364 Mass. 669, 680-682 (1974) (Hennessey, J., concurring); and the defendant had other convictions that could have been used to impeach him, see *Commonwealth* v. *Whitman*, *supra* at 95, a motion to exclude the murder conviction may well have succeeded.

We now consider whether the use of the murder conviction created a substantial likelihood of a miscarriage of justice, that is, whether it likely contributed to the verdict. We conclude that it did not. Trial counsel's strategy was to show that Langham and Jones were lying, and the linchpin of this aspect of her closing argument was that the defendant was "expendable" in their eyes because he already was serving a life sentence. Introducing the defendant's prior murder conviction was consistent with this strategy, and it was not manifestly unreasonable. See *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978). In addition, there were other serious felony convictions that were properly admitted to impeach the defendant; the prosecutor did not mention the murder conviction in his closing argument, see *Commonwealth* v. *Reid*, *supra* at 540; the judge gave both immediate and final instructions that forcefully limited the convictions to their proper use, and we presume that jurors follow the judge's instructions, see *Commonwealth* v. *Torres*, 437 Mass. 460, 464 (2002); and the case against the defendant was strong. We also note that the jury's verdict of acquittal on the

charge of assault with intent to murder suggests that they approached their duty dispassionately and were not inflamed by the prior murder conviction.

c. *Improper use of convictions.* The defendant argues that the prosecutor improperly explored the details of his murder conviction, particularly as to the identity of the victim, see *Commonwealth* v. *McGeoghean, supra* at 842-843, and that the prosecutor improperly laid out the terms of his sentences before the jury. See *Commonwealth* v. *Eugene*, 438 Mass. 343, 353 (2003). We agree.

The Commonwealth argues that the prosecutor's questions were proper because once the defendant introduced his prior convictions, the issue became "fair game" for further examination by the prosecutor. The Commonwealth relies on *Commonwealth* v. *Daley*, 439 Mass. 558, 560, 564-565 (2003) (prosecutor entitled to question defendant regarding his direct testimony that he had told victim he was on probation for selling cocaine), *Commonwealth* v. *Baldwin*, 385 Mass. 165, 178-179 (1982) (after defendant denied ever possessing gun, prosecutor entitled to question him about previous gun charge that had been dismissed), and *Commonwealth* v. *Morgan*, 6 Mass. App. Ct. 939 (1978) (prosecutor entitled to explore details of prior convictions which defendant introduced in his direct examination). These cases are distinguishable from the present case.

In *Commonwealth* v. *Daley, supra,* and *Commonwealth* v. *Baldwin, supra,* G. L. c. 233, § 21, had not been implicated, and the prior convictions, or their equivalent, had been used for other permissible purposes, similar to what has been discussed above in Part 3 of this opinion. The principle articulated in *Commonwealth* v. *Morgan, supra,* on which the Commonwealth relies, implicitly has been overruled by *Commonwealth* v. *Blodgett*, 377 Mass. 495, 502 (1979). The *Blodgett* case, which had been foreshadowed by *Commonwealth* v. *Cadwell*, 374 Mass. 308, 311-312 (1978), recognized that "[t]he reason for permitting a party to bring out the criminal record of his own witness is to avoid having the jury draw the inference that the party calling the witness had misled or deceived the jury as to the background of the witness." *Commonwealth* v. *Blodgett, su-*

*pra* at 502. It is apparent from the court's rationale for the new rule, namely, "the trial judge's control as to the order of proof," *id.*, that allowing a party to bring out the criminal record of his own witness was not meant to be a matter of direct examination, but a preview of anticipated cross-examination. As such, the cross-examiner is not entitled to explore underlying details of prior convictions with the broad blade of cross-examination permitted by Massachusetts practice, as once had been the case, but must now adhere to the limitations of rules governing impeachment by prior conviction, i.e., G. L. c. 233, § 21.

Although the prosecutor improperly elicited information concerning the identity of the victim and the length of the defendant's sentences, we think this did not create a substantial likelihood of a miscarriage of justice. The judge promptly and forcefully intervened and instructed the jury as to the proper use of prior convictions. He repeated his instruction at the end of the trial, emphatically telling the jury that they could not consider the prior convictions as evidence of guilt, nor could they permit themselves to become inflamed by the subject of the prior convictions. Contrary to the defendant's claim, the judge's instructions adequately defused the prosecutor's impropriety. Moreover, the case against the defendant was strong. The jury also appear not to have been swayed by the prosecutor's overreaching, as they acquitted the defendant on the indictment alleging assault with intent to murder.

Our discussion of this claim of error disposes of the related claim of ineffective assistance. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

5. *G. L. c. 278, § 33E.* We have considered the entire record, the briefs, and the arguments, and find no reason to grant relief under G. L. c. 278, § 33E.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*