SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. SAMMY LOZADA

 
 Docket:
 SJC-12985
 
 
 Dates:
 May 5, 2025 - July 17, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Hampden
 

 
 Keywords:
 Homicide. Practice, Criminal, Witness, Interpreter, New trial, Capital case. Interpreter. Evidence, Identification, Cross-examination. Witness, Cross-examination. Identification. Statute, Construction.
 
 

       Indictments found and returned in the
Superior Court Department on July 5, 2017.
      A motion for a new trial, filed on
December 7, 2021, was heard by Karen L. Goodwin, J.
      Travis H. Lynch, Assistant District Attorney,
for the Commonwealth.
      Michael J. Fellows for the defendant.
      WENDLANDT, J.  The defendant, Sammy Lozada, was convicted of
murder in the first degree for the stabbing death of Carlos Ramos
(victim).  The stabbing occurred in the
Holyoke apartment of Maria Samot, who was the prosecution's key identification
witness at trial.  Samot is deaf,
illiterate, and severely language deprived; she lacks the ability to
communicate in any recognized language, including American Sign Language
(ASL).  Instead, Samot communicates using
a limited set of idiosyncratic gestures grounded in her Hispanic cultural
background.  At trial, her testimony was
presented by a team of two certified deaf interpreters and two ASL interpreters.  
      No determination regarding the
appropriateness of these interpreters in view of Samot's severe communication
challenges was made as required by G. L. c. 221, § 92A
(§ 92A or statute). Specifically, the statute mandates that "no
testimony shall be admitted as evidence until" the trial judge determines
that an interpreter can communicate accurately with, and translate to and from,
a deaf witness.  G. L. c. 221,
§ 92A, third par.  This lapse proved
especially problematic during Samot's testimony on cross-examination when trial
counsel asked her questions that elicited dozens of nonresponsive answers
repeatedly stating that the defendant stabbed the victim.  
      Following his conviction, the defendant
filed a motion for a new trial, contending that "justice had not been
done" because of noncompliance with the statute.  See Mass. R. Crim. P. 30 (b), as
appearing in 435 Mass. 1501 (2001).  The
motion judge, who was also the trial judge, held an evidentiary hearing at
which experts specializing in communications with severely language deprived
persons testified as to the extent of Samot's communications challenges and
opined that the team of interpreters provided to Samot at trial often were
unable to communicate with Samot or translate to and from her accurately.  The judge, who herself had observed the
communication missteps during the trial, credited the experts' testimony and
found, inter alia, that the error in failing to make the determination required
under § 92A, third par., raised a substantial risk of a miscarriage of
justice.  Accordingly, she allowed the
defendant's motion.  
      The Commonwealth appealed.  Concluding that the judge did not abuse her
discretion in allowing the motion, we affirm. 

      1. 
Background.  a.  Facts. 
We summarize the facts as the jury could have found them, reserving
certain details for later discussion. 
See Commonwealth v. Wiggins, 477 Mass. 732, 734 (2017). 
      In the early morning of April 28, 2017,
Jose Espada was walking on Maple Street in Holyoke when he encountered the
defendant and his associate, Madeline Garcia. 
Espada, who was homeless, was on his way to a friend's vehicle to sleep;
he was carrying a brown-handled knife with a one-inch wide blade and his tablet
computer device.  The defendant took the
tablet from him, saying, "Now this is mine."  After a failed attempt to recover his
property, Espada went to a nearby corner store. 
A few moments later, however, the defendant and Garcia found Espada and asked
him to unlock his tablet so that they could "hock" it for twenty
dollars.  Espada acquiesced, in part
because the defendant offered to let him sleep at the defendant's home. 
      The defendant, Garcia, and Espada walked
to an apartment building on Maple Street. 
The defendant and Garcia entered an apartment while Espada remained
outside the apartment door. 
Approximately five minutes later, the defendant and Garcia emerged from
the apartment without the tablet.  The
trio then proceeded to the defendant's home on High Street.  Espada had planned to sleep on the
defendant's couch but decided against it, telling the defendant that he was
going to sleep in his friend's vehicle. 
In response, the defendant announced his intent to get the tablet back
right then. 
      The cohort returned to the apartment
building on Maple Street and ascended the stairs to the apartment they had
visited previously.  After knocking on
the door and receiving no answer, the defendant kicked the door open and asked
Garcia, "Baby, are you ready?" 
The defendant and Garcia then entered the apartment, while Espada
remained outside on the porch.  From
outside, Espada heard someone asking, "Sammy, what's going on?"  Then he heard screaming.  Espada peered inside; he saw the defendant
holding a black-handled knife and the victim leaning over the sink with blood
on the front of his shirt.  He also saw
Samot in the room.  The defendant
demanded to know where the tablet was. 
In response, the victim asked "Sammy" not to stab him again
because, in his words, he was "already dying."  
      Espada saw the defendant leave the
apartment, tablet in hand.  By then, the
victim had made his way to the porch; he grabbed onto Espada before falling on
the ground face first.  Believing that
the victim was dead, Espada fled down Maple Street; in his flight path, he
tossed the brown-handled knife he had been carrying into bushes, where it was
subsequently recovered by police. 
      Responding Holyoke police officers found
the victim prone and bleeding.  He was
taken to a hospital, where he was pronounced dead at 3:13 A.M. that same early
morning.  On entering the Maple Street
apartment, police found Samot in a frantic state.  She was taken to the police station, where
officers interviewed her with the assistance of two interpreters -- both of
whom would subsequently provide interpretation services for Samot during her
testimony at the defendant's trial. 
During the police interview, Samot identified photographs of both the
defendant and Garcia from two different photographic arrays.[1] 
      Although police secured the crime scene, an
officer later located Marie Karbone hiding inside a closet in the
apartment.   Karbone led police to a
trash chute on the third floor, where they found a bent, black-handled knife
with blood on its one-half inch wide blade. 
Deoxyribonucleic acid (DNA) testing showed that the blood was consistent
with the victim's DNA; no forensic evidence tied the black-handled knife to the
defendant.[2]  A medical examiner
testified to a reasonable degree of medical certainty that the fatal wound was
more consistent with the thinner blade of the black-handled knife than that of
the brown-handled knife discarded by Espada, which, the examiner noted, tested
negative for blood.  
      b. 
Samot's trial testimony.  At
trial, Samot was the prosecution's key identification witness.  The crime occurred at her apartment, and she
testified that it occurred in her presence. 
Samot's testimony, unlike that provided by Espada, the prosecution's
other identification witness,[3] was not given pursuant to a cooperation
agreement with the prosecution.  Samot
testified at trial through the assistance of two certified deaf interpreters
and two ASL interpreters.  As noted
supra, no one requested a determination under § 92A, third par., and the
trial judge did not make the required determination. 
      Because of Samot's linguistic limitations,
including that she was severely language deprived, deaf, and did not
communicate through ASL, the interpreters utilized various strategies to
attempt to communicate with and translate to and from Samot, including the use
of photographs, gestures, and miming certain actions, such as the thrusting of
a knife.[4]  Through this interactive
process, Samot testified on direct examination that the defendant had pushed
open the apartment door, removed a black-handled knife from his pocket, and
stabbed the victim.  She pointed
repeatedly at the defendant to indicate that he was the perpetrator. 
      Nevertheless, despite the use of some
props and the interpreters' efforts, Samot's answers to several of the prosecutor's
questions were nonresponsive.  For
example, when the prosecutor asked Samot if the defendant's appearance had
changed since she had last seen him, Samot answered only, "That's
him."  When asked why the victim had
been at her apartment, Samot did not explain the victim's presence in her
apartment and instead replied, "He was stabbed there."  And when asked where the defendant went after
the stabbing, Samot did not indicate the direction of the defendant's flight
and instead answered, "He stabbed him."  After a series of nonresponsive answers, the
trial judge noted the communication difficulties.[5]
      The moments of disconnection that occurred
during Samot's direct examination paled in comparison to what transpired on
cross-examination by trial counsel, who, unlike the prosecutor, did not work
with Samot pretrial in order to develop props or other tools.[6]  During cross-examination, after Samot
acknowledged that a woman -- Karbone –- had been found in her apartment two
hours after officers secured the crime scene, trial counsel asked Samot how she
had learned of Karbone's presence. 
Rather than provide any information about Karbone, Samot stated, "I
saw him."  While trial counsel
eventually was able to have Samot acknowledge that a woman had been found in
her apartment, he could not obtain further details regarding their relationship
despite several attempts at rephrasing the question.  
      Trial counsel encountered similar problems
when he asked Samot to identify who came through the front door of her
apartment and who was present in the kitchen during the stabbing.  Out of seven questions regarding who was in
the kitchen, Samot gave six nonresponsive answers and, in three of those
answers, stated that the defendant stabbed the victim.[7]  Despite his efforts, trial counsel did not
receive a responsive answer to his question as to who was in the kitchen. 
      Later, when Samot appeared to suggest that
the defendant was the sole intruder to come through the front door before the
stabbing,[8] trial counsel asked her about her prior statement to police
officers that three people -- two men, the defendant and Espada, and one woman,
Garcia -- had entered the apartment. 
Samot's explanations were conflicting and inconsistent, but trial
counsel was not able to confront her with her prior inconsistent statements
because of the limits of the available interpretation.  Similarly, trial counsel could not confront
the witness that her answers at trial regarding the color of the defendant's
hat and whether Garcia took money from the victim differed from the information
she had previously provided to police officers.[9] 
      At a sidebar conference toward the end of
cross-examination, the trial judge expressed serious doubt about Samot's
ability to understand complex questions.[10] 
The interpreters, who were allowed to join the attorneys at the sidebar,
informed the trial judge that Samot had difficulty understanding
"abstract" concepts, like space and time:  "[A]bstract is hard to turn into
concrete for [Samot].  So abstract
questions and statements, in [her] language, it's impossible.  You have to be concrete."  Despite that guidance, trial counsel was
unable to obtain responsive answers from Samot. 
Following the sidebar, he tried once more to ask Samot about whether she
had told officers that Garcia had taken money from the victim.  After that attempt failed to elicit a
responsive answer, trial counsel simply ended his cross-examination; he did not
move to strike any of the nonresponsive answers to his questions. 
      The jury found the defendant guilty of
murder in the first degree on the theories of deliberate premeditation, extreme
atrocity or cruelty, and felony-murder, G. L. c. 265, § 1; armed robbery, G. L.
c. 265, § 17; two counts of home invasion, G. L. c. 265, § 18C; and malicious
destruction of property, G. L. c. 266, § 127.  
      c. 
Posttrial motion practice.[11]  In
March 2023, the defendant filed an amended motion for a new trial together with
a motion for an evidentiary hearing, Mass. R. Crim. P. 30 (b), alleging, inter
alia, that the testimony provided by Samot was "inadmissible and highly
prejudicial" and "improperly allowed into evidence" without the
preliminary determination mandated by § 92A.  In November 2023, the trial judge, pointing
to questions surrounding "the accuracy of the translation of the oath and
testimony of a key government witness," allowed the defendant's motion for
an evidentiary hearing.[12] 
      d. 
Evidentiary hearing.  The judge
conducted a four-day evidentiary hearing, during which the defendant offered
evidence from three expert witnesses, Drs. Judy Shepard-Kegl, Romy Spitz, and
Eileen Forrestal; Fatima Silvestre, one of the interpreters who had provided
translation services to Samot during her police interview and trial; and trial
counsel.  
      The experts, each of whom possessed a
background in linguistics and interpreting for language deprived individuals,[13]
testified that while Samot's testimony could have been interpreted accurately
with proper preparation and appropriate props, the methods used at trial were
insufficient to ensure accuracy. 
Specifically, the experts testified that visual gestural communication
is the style of communication best suited to converse with, and translate on
behalf of, language deprived persons. 
This method requires that the translator receive bits and pieces of
information through gestures unique to the subject and then "fill in the
gaps" through "inference and assuming context."[14]  To do this, the interpreter must have some
facility with the subject's cultural background -- in order to understand
culturally based gestures -- and be able to "negotiate the meaning of
certain gestures" until he or she understands what the subject means by a
gesture in a given context.[15]  
      The experts also testified that while the
gestures used by a deaf and language deprived person may overlap with ASL, the
gestures are ultimately idiosyncratic to the subject, and one gesture may have
several different meanings depending on the context in which it is used.  Additionally, persons who are both deaf and
severely language deprived, unlike persons who communicate through ASL, lack a
system of grammar.  Thus, they are unable
to convey information using prepositional phrases (e.g., "who did what to
whom"), time, sequence of events, and cause and effect unless aided by
props or other tools.  Shepard-Kegl
testified that, for this reason, Samot provided several of her nonresponsive
answers at trial; specifically, Samot would focus on "one or two little
pieces" of information from the larger question, such as the gesture for
"to stab," and give "what she can in terms of information."[16]

      The experts testified that, based on their
review of the videotape of Samot's police interview following the stabbing, there
were numerous translation deficiencies that occurred.  For example, Spitz testified that the
interpreters mistranslated Samot's gesture for "man" or
"boy," which was a common gesture grounded in her Hispanic culture,
to mean "hat" or "baseball hat."  The experts agreed, however, that Samot had
identified the defendant as the person she "believe[d]" committed the
murder.[17]
      The experts could not conduct a similar
analysis of Samot's trial testimony because the trial was not videotaped.[18]  Nonetheless, based on their review of the
transcripts, the experts agreed that many of the same interpretation issues
that affected the accuracy of the police interview also were present at
trial.  Spitz cited Samot's nonresponsive
answers as evidence that she did not understand several questions posed by
trial counsel on cross-examination. 
Additionally, Shepard-Kegl flagged that two of the trial interpreters
had also provided their interpretation services at the police interview; in her
opinion, the dual role presented a conflict of interest that, at a minimum,
should have been disclosed to the parties because it could affect the accuracy
of the interpretation at trial. 
      In her testimony, Silvestre, who was one
of the two interpreters translating during Samot's police interview,
acknowledged the possibility that her trial interpretation could have been
influenced by her prior experience with Samot. However, when pressed by the
judge, Silvestre maintained she was "[ninety-nine percent] confident"
in the accuracy of the trial translation, adding that the team of four
translators, working together, "did the best [they] could do at that
time."  The judge credited
Silvestre's testimony as to her belief in the fidelity of the translation but
found that Samot's nonresponsive answers ultimately "reflected
problems" with the interpretation and that Silvestre's "dual
role" raised at least the "possibility" of unconscious
influence.  
      For his part, trial counsel testified that
he had no strategic reason for not moving to strike Samot's nonresponsive
answers during cross-examination, which the judge credited. 
      e. 
Allowance of amended motion and instant appeal.  In July 2024, the judge allowed the
defendant's amended motion for a new trial, reasoning that the admission of
Samot's testimony was improper absent the determination required under
§ 92A, third par., and, in this case, the error created a substantial risk
of a miscarriage of justice.  More
specifically, the judge concluded that in the course of making the statutorily
required determination, the challenges in conveying abstract concepts to Samot
would have been revealed; the need for counsel to supply props in order to
examine her effectively would have been learned; and the difficulties and
potential risks for miscommunication (e.g., addition, omission, confabulation,
etc.) that come with interpreting testimony from a language deprived person
would have surfaced.  The judge further
stated that, while an "unlikely" outcome, it was possible that a
§ 92A hearing could have resulted in the total exclusion of Samot's
testimony.  Finally, the judge concluded
that the defendant had also established that he is entitled to a new trial on
the grounds of ineffective assistance of counsel.  See Commonwealth v. Saferian, 366 Mass. 89,
96 (1974).  The Commonwealth
appealed.  
      2. 
Discussion.  A judge may
"grant a new trial at any time if it appears that justice may not have
been done."  Mass. R. Crim. P.
30 (b).  We review the judge's allowance
of the defendant's motion "for abuse of discretion or other error of
law."  Commonwealth v. Gaines, 494
Mass. 525, 536 (2024).  An abuse of
discretion occurs when the judge makes a "clear error of judgment in
weighing the factors relevant to the decision . . . such that the
decision falls outside the range of reasonable alternatives."  Id., quoting Commonwealth v. Kolenovic, 471
Mass. 664, 672 (2015), S.C., 478 Mass. 189 (2017).  A reviewing court extends "special
deference" to the decision of a motion judge who was also the trial judge,
Commonwealth v. Rosario, 460 Mass. 181, 195 (2011), quoting Commonwealth v.
Grace, 397 Mass. 303, 307 (1986), and that "judge's findings of fact after
an evidentiary hearing on a motion for a new trial will be accepted if
supported by the record," Rosario, supra, quoting Commonwealth v. Walker,
443 Mass. 213, 224 (2005).
      The Commonwealth proffers three claims of
error relating to the judge's decision to allow the defendant's motion for a
new trial.  We address each in turn.
      a. 
Enforceability of § 92A.  The
Commonwealth first contends that § 92A, third par., provides no
enforceable right to the defendant, who himself is not deaf or hearing impaired,[19]
to challenge noncompliance with the requirements of the statute.  In the Commonwealth's view, the rights
created by the statute are intended for -- and belong solely to -- the person
who is deaf or hearing impaired and thus needs the services of an interpreter
under § 92A.  
      To be sure, certain provisions of
§ 92A exclusively concern the rights of deaf and hearing-impaired
persons.  See, e.g., G. L.
c. 221, § 92A, first par. (permitting deaf or hearing-impaired person
to waive statutory right to qualified interpreter), second par. (providing
that, inter alia, deaf or hearing-impaired arrestee is entitled to interpreter
during police interrogations), seventh par. (establishing privilege for
confidential communications between certified sign language interpreter and any
deaf or hearing-impaired person using services of said interpreter).  See also Commonwealth v. Elliott, 87 Mass.
App. Ct. 520, 530 n.7 (2015) (stating, in case involving hearing-impaired
defendant, "over-all objective" of § 92A is "to ensure that
deaf and hearing-impaired persons can understand and fully participate in the
legal proceedings in which they are involved" [citation omitted]).
      The third paragraph of § 92A,
however, is not so limited.[20]  It sets
forth an evidentiary rule that protects not only the deaf or hearing-impaired
witness, but also those, like the defendant in the present action, who have a
substantial interest in the outcome of the proceeding.  For example, it requires that, prior to the
admission of testimony, the interpreter is situated to assure effective
communications "between all persons having a substantial interest in the
outcome of such proceedings," expressly acknowledging the interest of
others in proceedings where an interpreter is provided to a deaf or
hearing-impaired person.  G. L.
c. 221, § 92A, third par.
      Importantly to our present analysis,
§ 92A, third par., also precludes testimony until the person conducting
the proceeding, here the trial judge, "determines, on the basis of
testimony of the interpreter and the deaf or hearing-impaired person, that such
interpreter is able . . . to communicate accurately with and
translate information to and from such deaf or hearing-impaired
person."  Id.  Contrary to the Commonwealth's suggestion,
this provision is not tethered exclusively to, and does not benefit only, the
deaf or hearing-impaired person herself. 
It broadly sets forth a prerequisite to the admission of testimony
through a § 92A interpreter. 
Specifically, it provides that "no testimony shall be admitted as
evidence" until this and the other two prerequisites are met.  See Hashimi v. Kalil, 388 Mass. 607, 609
(1983) (word "shall" ordinarily interpreted as having "a
mandatory or imperative obligation"). 
See, e.g., Commonwealth v. Steeves, 490 Mass. 270, 280 (2022), quoting
United States v. Scheffer, 523 U.S. 303, 308 (1998) (State lawmakers "have
broad latitude under the Constitution to establish rules excluding evidence
from criminal trials").  Thus,
contrary to the Commonwealth's contention, the defendant falls squarely within
those the Legislature intended to benefit by virtue of the statute.  In short, the defendant may challenge
evidence offered against him in his own criminal case on the ground that it was
erroneously admitted in violation of § 92A, third par.[21]  See Mass. G. Evid. § 103(a) (2025)
(party may claim error in ruling to admit evidence if ruling, inter alia,
"injuriously affects a substantial right of the party").  See also G. L. c. 231, § 119
(same).  
      b. 
Appointment of substitute interpreter. 
Second, the Commonwealth maintains that where a judge determines under
§ 92A, third par., that an interpreter cannot render an accurate
translation, the remedy is the appointment of a replacement interpreter
pursuant to § 92A, fourth par.  The
fourth paragraph of § 92A provides that 
"[i]f, at
any time during the proceeding, it is determined that the interpreter is no
longer able to provide effective communication between the parties, the person
conducting such proceeding shall appoint another qualified interpreter or an
intermediary interpreter in accordance with the provisions of this
section."  
      The plain language of § 92A, fourth
par., provides no support for the Commonwealth's argument.  In particular, the phrases "during the
proceeding" and "is no longer able to provide effective communication
between the parties," in § 92A, fourth par., presuppose that the
determination required under § 92A, third par., has been made.  That latter provision, as discussed supra,
provides its own remedy:  "no
testimony shall be admitted as evidence until" the threshold determination
has been made.  See G. L.
c. 221, § 92A, third par.  The
fourth paragraph thus, rather than providing a remedy where the threshold
determination has not been made, provides a remedy for a different situation,
namely, where the threshold determination required under § 92A, third
par., has been made and then it becomes apparent during the proceeding that the
original interpreter is no longer able to function effectively.  In sum, the process of appointing a
substitute interpreter has no bearing on whether a required threshold
determination to establish the competency of an interpreter is a prerequisite
to the admission of a deaf person's testimony. 
      c. 
New trial.  Because trial counsel
did not object to the failure to make a threshold determination under
§ 92A, third par., the defendant was entitled to relief "only if the
defendant demonstrates a substantial risk of a miscarriage of justice, namely,
a serious doubt whether the result of the trial might have been different had
the error not been made" (quotations and citations omitted).  Commonwealth v. Brescia, 471 Mass. 381, 389
(2015).  See Commonwealth v. Bly, 444
Mass. 640, 648 (2005) ("assertions of unpreserved error offered as the
basis of a claim of ineffective assistance of counsel in a motion for a new
trial are evaluated in a case of murder in the first degree under a substantial
likelihood of a miscarriage of justice standard").  We discern no abuse of discretion in the
judge's conclusion that a substantial risk of a miscarriage of justice is
present here.    
      To begin, the judge concluded that the
failure to make a determination under § 92A, third par., as to the
adequacy of the interpreter team's ability to accurately communicate with and
interpret to and for Samot was error ("It is uncontroverted that the trial
court did not comply with this statute"). 
That provision, as discussed supra, required the judge to make that
determination as a prerequisite to the admission of any testimony from
Samot.  See G. L. c. 221,
§ 92A, third par.  No such
determination was made, and Samot testified through interpreters who may have
done their best but were nonetheless ill equipped to communicate with Samot and
to translate to and for her as a severely language deprived individual.  This was error.
      Next, the judge concluded that the failure
to make the determination prior to allowing Samot to testify prejudiced the
defendant.  While the judge acknowledged
that it was "unlikely" that a determination under the statute would
have resulted in the exclusion of Samot's testimony altogether, the
Commonwealth's contention that the defendant was not prejudiced ignores the
prejudice, well articulated by the judge, stemming from how Samot's testimony
could have come in -- a procedure that necessarily would have involved, inter
alia, tools and props -‑ which would have been revealed during the
determination that was, in error, never made. 
See Commonwealth v. Kelley, 404 Mass. 459, 463 (1989) (violation of
§ 92A, second par., entitled hearing-impaired defendant to remedy
"adequate to cure any prejudice" resulting from violation, including
dismissal where apt).  The judge observed
that the determination under § 92A, third par.,   
"would have
disclosed the challenges of communicating with and interpreting [for]
Samot.  The assessment would have
identified difficulties in conveying abstract concepts to Samot, the need to
understand idiosyncrasies in [her] use of gestures, the need for props to be
supplied by counsel for the party examining Samot, and the risks of the
ambiguity and/or co-creation by the interpreters of Samot's testimony."
In other words,
the statutorily required determination would have revealed -- in accordance
with the credited testimony of the experts -- that Samot likely could give
testimony,[22] but only if the proper resources for translating for a severely
language deprived person were available to the interpreter, who was trained to
provide translation for a person with Samot's language challenges.      
      The judge, who, as the trial judge, was
well positioned to observe firsthand the consequences of the error in failing
to make the § 92A determination, see Rosario, 460 Mass. at 195, found
Samot's nonresponsive answers "reflected problems" with the translation
that was provided.[23]  Not only was
trial counsel unable to cross-examine Samot on salient details related to the
killing, but his attempts to do so were often met with nonresponsive statements
that the defendant was the killer.[24]   

      Relying on the experts' testimony at the
posttrial hearing, the judge found that the interpreters assigned to Samot
during the defendant's trial lacked the requisite skill set to translate
accurately to and for Samot.  None was
proficient in visual gestural communication, the mode of communication best
suited to converse with and translate on behalf of a severely language deprived
person, like Samot.
      In addition, the judge found that two of
the interpreters had already mistranslated several of Samot's culturally
specific gestures during her interview with police officers, errors that went
uncorrected and therefore likely were repeated at trial.  The judge concluded that "[t]he
proceeding required by § 92A would have informed the entire course of
Samot's testimony."  A § 92A,
third par., determination likely would have revealed that the assigned
interpreters could not "communicate accurately with," or
"translate information to and from," Samot.  G. L. c. 221, § 92A, third
par.  These findings are well supported
by the record.  
      The judge concluded that failure to
comport with the statute "materially influenced the verdict."  Commonwealth v. McCoy, 456 Mass. 838, 850
(2010).  Other than Espada, who testified
pursuant to a cooperation agreement, Samot was the sole witness at trial to
place the black-handled knife in the defendant's hand;[25] moreover, she alone
testified to seeing the stabbing.  Samot
was a critical identification witness; without her testimony, the jury's focus
naturally may have shifted to Espada and Garcia, each of whom had the victim's
blood on their clothing. 
      Finally, the judge's conclusion that trial
counsel's failure to request a § 92A hearing or object to the admission of
Samot's testimony was not the product of a reasonable tactical decision is
unassailable.  See McCoy, 456 Mass. at
850.  Trial counsel testified at the
posttrial hearing that there existed no "good reason" for failing to
move to strike Samot's nonresponsive answers; nor did it occur to him, either
before or during trial, to move to examine her competency.  
      3. 
Conclusion.  On the record before
us, we discern no abuse of discretion in the judge's allowance of the
defendant's amended motion for a new trial, and on that basis we affirm the
order.[26]
So ordered.

footnotes

[1] A video
recording of the interview was not introduced as an exhibit at trial but was
entered as an exhibit at the evidentiary hearing on the defendant's amended
motion for a new trial.

[2] At trial, the
prosecution relied on the testimony of Espada and Samot to tie the defendant to
the black-handled knife. 

[3] Garcia had
pleaded guilty to armed robbery and was sentenced to a term in prison in
December 2019.  She did not testify at
the defendant's trial.

[4] Partway through
Samot's testimony, the trial judge instructed the jury as to what parts of the
interpreters' exchanges with Samot constituted evidence -- e.g., "[w]hat
the interpreters say verbally was the answer of . . . Samot to the
question" posed -- and what parts did not constitute evidence -- e.g., the
gestures used by interpreters to "relate" questions to her.

[5] At a sidebar
conversation on how best to authenticate an exhibit, the trial judge remarked
that "[i]t's just so difficult to communicate with her."   
      
[6] To
illustrate, the prosecutor came prepared with a floor plan of Samot's apartment
to aid her in answering where she was in the house when the stabbing
occurred.  By contrast, trial counsel was
unable to ask his first question as styled -- "How long had you known [the
victim]?" -- because neither party had brought a visual aid, such as a
calendar, that might have enabled Samot to understand the question.  

[7] The following
excerpt provides a representative sample of this exchange: 
      Q.: 
"My question was, at the time that you went into the kitchen, who
was in the kitchen?"
      A.: 
"Him[, the defendant]."
     . . .      
      Q.: 
"And he was the only person in the kitchen?"
    A.: 
"I saw him.  I saw him.  He did it."      
Q.:  "My question again, who did you see in
the kitchen when you first came into the kitchen?"

A.:  "I saw the door being pushed open and I
saw him stab [the victim]." 
      
[8] Samot testified
as follows:     
Q.:  "And after [the defendant] came in, did
you see another man come in?"
A.:  "It was [the defendant].  It was this guy."
Q.:  "And he was the only one who came
through the door after the door was opened?"
A.:  "It was one guy.  It was him."

[9] Trial counsel
was able to elicit this information from a police officer whom he called in
rebuttal.  The officer testified, inter
alia, that Samot had not told them that Garcia had taken money from the victim
and that she had said a second man had entered the apartment with the
defendant. 

[10] The trial
judge specified that while she had no doubts that Samot was
"competent" to testify, she was troubled by the fact that
"complex questions are going by her": 
"When she's asked about whether she talked to somebody at another
time and what she told the person at another time, she doesn't seem to be
getting that. . . .  She
just keeps repeating, and she gives a nonresponsive answer."  

[11] The defendant
timely filed a notice of appeal. In December 2021, he filed a motion for a new
trial before this court, which we remitted to the trial court.

[12] This court
stayed consideration of the defendant's direct appeal pending resolution of his
amended motion for a new trial.

[13] Dr. Judy
Shepard-Kegl has a doctorate in linguistics from the Massachusetts Institute of
Technology and advanced training in cognitive neuroscience and interpreting;
she has directed the interpreter training programs at the University of
Southern Maine for twenty-five years. 
Dr. Romy Spitz has a doctorate in psychology and has completed
postdoctoral work in brain bases of language impairment; she has thirty years
of experience in assessing individuals with language deprivation.  Dr. Eileen Forrestal, Ph.D., coordinated the
ASL and deaf studies program at Union College prior to her retirement.  She has interpreted hundreds of times over
the past ten years for individuals who are deaf as well as language deprived,
including in court room settings.  

[14] Put another
way, the interpretation that is eventually conveyed is a
"co-construction" by the interpreter based on information provided by
the "speaker"; it is not that of the speaker alone. 

[15] Spitz
testified that, had she been asked to translate for Samot at trial, she would
have enlisted the services of someone from Samot's culture to watch for
idiomatic gestures:  
"I would
have asked for someone from her culture to give feedback to the team about any
cultural signs or gestures that she has. 
For example, her sign for good friend[;] [h]er gesture for that looks a
lot like the ASL sign for spouse.  But
someone from that culture could have given that information to the interpreting
team." 

[16] As an
example of this phenomenon, and to illustrate how Samot's grammar deficiency
would impede her ability to answer a multipart question, Shepard-Kegl
explained:
"[W]hen
someone asks a question like, . . . '[D]id you ever tell anyone that
the woman took the money after [the victim] was stabbed?'  That . . . string[,] [a]ll [Samot]
would get out of that, at best, is 'woman' and 'money,' and she would come back
with whatever response she . . . was going to give, and . . . and
what she's coming back with is 'woman,' 'money.'  The woman took the money.  So[,] it's not telling me that she's
responding to the question . . . ." 

[17] Shepard-Kegl
qualified her answer with the word "believe" because it was never
established at the police interview that Samot saw the stabbing. 

[18] While, in
this case, the motion judge was the trial judge and thus was well positioned to
assess the effect of the failure to comply with § 92A, third par., in view
of the posttrial evidence presented by the defendant, we recognize that that
will not always be the case.  A videotape
of testimony of a deaf or hearing-impaired party or witness would better
preserve the testimony for posttrial motions and appellate review.

[19] In this
opinion, we refer to the term "hearing impaired" given that it is the
term used in G. L. c. 221, § 92A. 

[20] The third
paragraph of § 92A provides:  
"In all
proceedings involving an interpreter under this section, no testimony shall be
admitted as evidence until: 
"(1) the
interpreter is so situated as to assure effective communication between all
persons having a substantial interest in the outcome of such proceedings,
"(2) the
interpreter swears under oath, that he will provide a true and accurate
interpretation of the proceedings to the best of his skill and judgment, and
"(3) the
person conducting such proceedings determines, on the basis of testimony of the
interpreter and the deaf or hearing-impaired person, that such interpreter is
able in that particular proceeding, to communicate accurately with and
translate information to and from such deaf or hearing-impaired person
involved."  (Emphases added.) 
G. L.
c. 221, § 92A, third par.

[21] The
defendant notes that the absence of an accurate interpreter for Samot
implicated his constitutional right to confront witnesses against him, and thus
required a new trial.  We need not reach
this argument because we agree with him that the judge did not abuse her
discretion in allowing his motion for a new trial on the basis of the statutory
violation.  See Commonwealth v. Loretta,
386 Mass. 794, 797 (1982) ("If a case can be decided on nonconstitutional
grounds, the better course is to decide it by not reaching the constitutional
issue").  

[22] On this
point, Shepard-Kegl agreed that there was "no question" that Samot is
cognitively competent and testified that Samot could "communicate with the
proper resources[ and] supports." 
Spitz concurred that Samot was cogitatively and communicatively
competent and added that an expert "could have got the story of what
happened from [her]" because "[s]he is capable of communicating it
through . . . tools or strategies."  Forrestal testified that, based on her
viewing of the videotape of the police interview, Samot demonstrated a
"basic form" of communication and understood the questions asked of
her "about half of the time." 

[23] Contrary to
the Commonwealth's argument, the judge did not adopt Silvestre's
self-assessment that the translation was accurate despite Silvestre's statement
at the posttrial hearing that Silvestre was herself "[ninety-nine percent]
confident" in the translation.  While
the judge found Silvestre to be a candid witness, her findings were ultimately
contrary to Silvestre's self-assessment.

[24] In fact, the
prosecutor highlighted Samot's nonresponsive answers in her closing argument,
stating:  "[A]t no point did
. . . Samot falter or hesitate as she sat down in the witness stand,
looked across from the defendant and said, over and over, 'That's the man who
stabbed [the victim].'"

[25] While stains
located on the blade of the black-handled knife tested positive for the
victim's DNA, the defendant's DNA was not found on the object.

[26] Because we
affirm the grant of a new trial on evidentiary grounds, we need not reach the
judge's subsidiary finding that trial counsel's performance was
constitutionally ineffective.  See
Loretta, 386 Mass. at 797.